In re Eugene T. AUSTIN, Respondent.

A Member of the Bar of the District
of Columbia Court of Appeals.

No. 02–BG–786.

District of Columbia Court of Appeals.

Argued Jan. 15, 2004.

Decided Sept. 2, 2004.

Eugene T. Austin, pro se.

Julia L. Porter, Senior Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel, was on the brief, for the Office of Bar Counsel.

Elizabeth J. Branda, Executive Attorney, for the Board on Professional Responsibility.

Before SCHWELB, RUIZ, and REID, Associate Judges.

RUIZ, Associate Judge:

In this disciplinary proceeding, the Board on Professional Responsibility, with one member dissenting, has recommended that Eugene T. Austin be suspended from the practice of law for eighteen months with reinstatement conditioned on proof of fitness and on the payment of full restitution to his client and to the Clients' Security Trust Fund of the District of Columbia Bar. The Board's recommendation is based on findings by a hearing committee that respondent engaged in improper business transactions with a client in violation of Rule 1.8(a) (prohibiting business transactions with clients that create conflicts of interest) and related acts of dishonesty in violation of Rule 8.4(c) (defining, *inter alia,* dishonesty as professional misconduct) of the District of Columbia Rules of Professional Conduct. Although the Board adopted the committee's findings, it disagrees with the committee's conclusion that respondent's acts amounted to theft and fraud, and that his repeated acts of dishonesty call for disbarment. Bar Counsel, in her submission to the court, supports the hearing committee's recommendation for disbarment arguing that the Board's recommended sanction fails to apprehend the severity and extent of respondent's misconduct and is inconsistent with the sanctions imposed in other cases involving serious and pervasive dishonesty. The Board responds by asserting that Bar Counsel's allegations of theft and fraud are inconsistent with the specification of charges and that the record does not support a finding by clear and convincing evidence that respondent acted with fraudulent intent.

We agree with the Board that respondent violated Rules 1.8(a) and 8.4(c). However, we find that the specification of charges and subsequent filings by Bar Counsel gave respondent sufficient notice of the charges of theft and fraud and that his misconduct is of a magnitude that calls for disbarment. Accordingly, we order respondent disbarred from the practice of law in the District of Columbia, and condition his future re-admission to practice on full restitution to his client and the Clients' Security Trust Fund.

## I.

## BACKGROUND

The hearing committee heard from six witnesses: Lettie Garland Saunders (the

complainant), Willie T. Saunders (her nephew), Francis X. Gaegler, Jr., Christina Spears, Karen Palmer, and John Irving Kraemer. Respondent filed an answer to the complaint but did not attend, nor was he represented during, the hearing.

We begin with a recitation of the hearing committee's findings of fact. In late 1994, respondent was introduced to Ms. Lettie Saunders by his neighbors, who were Ms. Saunders's relatives. She was interested in finding a lawyer who could represent her in connection with a probate claim involving her brother's estate. Respondent agreed to represent her in connection with that matter. Ms. Saunders, who was 73 years of age when she retained respondent as her counsel, grew up in Chatham, Virginia, and only completed the fifth grade, leaving school when she was fourteen or fifteen years of age. As a result, she has minimal reading and writing skills. She lives in Washington, D.C., where she previously worked cleaning houses, earning approximately $50 per day, until she retired in 1991. She never married and has no children. In 1962, Ms. Saunders purchased her own home at 3050 Vista Street, N.E. where she lives with one of her sisters, who is disabled. Since her retirement, Ms. Saunders's only income comes from Social Security benefits, which amounted to $5,845.20 annually in 1994.

Around the time respondent agreed orally to represent Ms. Saunders in connection with the probate matter, he advised her to obtain a loan, secured by a mortgage on her home (a "reverse mortgage"), to finance the prosecution of her claim against her brother's estate. Ms. Saunders, however, does not recall asking respondent to assist her in obtaining such a mortgage on her property. On December 14, 1994, respondent sent an agreement to Ms. Saunders providing that she would pay him "an advance legal fee" of

$250 for his assistance in applying for the mortgage and an hourly fee of $65. In addition, the agreement stated that respondent had agreed to represent Ms. Saunders in connection with the probate matter, but that the terms of that representation would be covered by a second retainer agreement. Later, respondent gave Ms. Saunders a second retainer agreement which provided that she agreed to retain him "to investigate and prosecute the equitable claim against the estate of my deceased brother, Edward R. Saunders...." This retainer agreement again stated that Ms. Sanders would pay respondent an advance legal fee of $250 and an hourly fee of $65. Ms. Saunders does not dispute signing this agreement, but she asserts that she told respondent that she could not afford the fees described in the letter. As a result, respondent agreed to represent Ms. Saunders on a contingency fee basis.

In February 1995, several months after he had provided Ms. Saunders with the first engagement letter to obtain a reverse mortgage, respondent completed an application on behalf of Ms. Saunders and her sister for a loan from Capital City Mortgage Corporation, to be secured by a first deed of trust on Ms. Saunders's home. The loan application stated that Ms. Saunders sought a loan of $22,500 to pay off the balance of the mortgage on her brother's house, to pay "accrued legal fees in order to ensure continuance of civil litigation, prosecuting [her] creditor's claim ($30,-000—$100,000) against [her] deceased Brother['s] Estate," and to pay a credit card bill of approximately $1,000. According to Ms. Saunders's testimony before the hearing committee, she never discussed obtaining a loan for these purposes. The application disclosed Ms. Saunders's minimal savings and income. It stated that she had only $1,500 in personal savings and received less than $6,000 a year in

Social Security benefits. Respondent stated in the application he prepared, however, that she would be able to make the required loan payments because she planned to sell her home within the next year and expected to receive between $50,000 and $75,000 from her claim against her brother's estate by the end of 1995.

On February 3, 1995, Capital City Mortgage Corporation tentatively approved a $22,500 loan to Ms. Saunders at a rate of twenty percent per annum. Prior to closing, respondent wrote a letter to the settlement agent and Ms. Saunders stating that he had spent eighty hours providing legal services on her behalf and was therefore entitled to a fee of $5,200. Respondent's request was not supported by time records or any other document reflecting the services he had provided. Subsequently, respondent reduced his fee request by $2,500 and, after deducting the $100 in cash that he already had received from Ms. Saunders in December 1994, he told Ms. Saunders that she now owed him $2,600 of the loan proceeds as his fee. Although Ms. Saunders does not remember obtaining the loan, a settlement sheet dated March 8, 1995, indicated that Capital City Mortgage Corporation in fact approved the loan and funded it. According to the settlement sheet, $10,222.19 of the loan proceeds were paid to Household Finance Corporation to pay off Ms. Saunders's line of credit secured by a first deed on her home, $2,600 was paid to respondent, $7,272.34 was paid to Ms. Saunders, and the remainder was used to pay the fees and taxes associated with the loan.

In April 1995, respondent entered his appearance on behalf of Ms. Saunders in the probate of her brother's estate. Shortly after he entered his appearance in the probate matter, respondent told Ms. Saunders that she owed him $1,495 for time spent in that matter from January 9 to March 31, 1995. No time records or any other documentation were provided reflecting the services he claimed to have rendered. A few days later, Ms. Saunders told respondent that she could not afford his fee. Respondent nevertheless "took" the $1,495 from Ms. Saunders as his fee and then prepared and presented to her a new retainer agreement for representing her in the claim against her brother's estate. The new agreement provided that he would retain the $1,495 as payment for services already rendered and thereafter would be entitled to a contingency fee of thirty percent of the gross amount of any judgment, award, or settlement in the probate matter.

On August 8, 1995, the personal representative for the brother's estate filed a petition for determination of the validity of Saunders's claim, in which he asserted that it should be barred for various reasons. The court granted the petition and held evidentiary hearings. Respondent represented Ms. Saunders during the hearings. On February 5, 1997, the court issued an order disallowing Ms. Saunders's claim against the estate in its entirety. The ruling was not appealed.

With respect to the conflict of interest charges in violation of Rule 1.8(a), the hearing committee found that respondent admits that between June 1995 and December 1996, while representing Ms. Saunders in the probate matter, he sought and received a number of personal loans from her. At the time, respondent was aware of Ms. Saunders's limited financial resources and lack of sophistication. According to Ms. Saunders's testimony, when respondent first requested money from her, he told her that it was improper for an attorney to borrow money from his client, but that he was facing foreclosure on his home and needed the money "to keep his house out of foreclosure." Respondent did not

advise Ms. Saunders to seek the advice of independent counsel nor did he provide any collateral or security in exchange for any loans. Rather, respondent provided Ms. Saunders non-negotiable promissory notes setting forth the amount borrowed and his promise to repay the principal amount by a date certain with interest at the rate of ten percent per annum. In the case of some loans, respondent did not create a new promissory note, but rather modified an existing promissory note by changing the amount of principal borrowed and, in one instance, extending the date of repayment. Ms. Saunders and respondent then initialed the changes to the original promissory note. Most of the loans were in the form of cash except for one, which was by check. Ms. Saunders testified that, although she was not sure, she believed that the handwriting on the check, other than possibly the signature, was respondent's. Notwithstanding that he failed to repay previous loans as promised, respondent continued to borrow from Ms. Saunders.[1] In all, between June 13, 1995 and December 26, 1996, respondent borrowed $26,875.11 from his client.

On February 14, 1997, Ms. Saunders retained Francis Gaegler to assist her in recovering the funds that she had loaned to respondent. She also requested that Mr. Gaegler assist her by obtaining and reviewing the file relating to her claim against the estate. When Mr. Gaegler telephoned respondent concerning the loans, he was told that respondent "had a big case coming in" and would repay Ms. Saunders with his share of the funds. Shortly thereafter, Mr. Gaegler received a letter dated February 18, 1997, purporting to be from Ms. Saunders, stating that she was satisfied that she and respondent would resolve their "difficulties ... without the need to get involved in litigation" and that she wished to terminate Mr. Gaegler's services. Mr. Gaegler was "shocked" by the letter given his recent discussions with Ms. Saunders concerning her desire to collect the money. Based on Ms. Saunders's testimony that she did not write the letter to Mr. Gaegler and that it looked like someone had tried to copy her signature, the committee found that respondent typed the February 18, 1997 letter to Mr. Gaegler for Ms. Saunders's signature after becoming aware that Ms. Saunders had retained Mr. Gaegler to assist her in collecting the loans. During the hearing, Bar Counsel presented testimony from an expert who compared the original of the February 18, 1997 letter with the original promissory note of December 11, 1996 that respondent had prepared and signed two months earlier. The expert found that the documents shared the same IBM-style type, font, and pitch, that they were produced by the same type of self-correcting typewriter, and that they used the same watermarked Eaton brand stationery manufactured in 1995. Ms. Saunders testified that she did not have a typewriter or stationery. As a result, the committee found that respondent either signed Ms. Saunders's name on the letter or procured her signature on the letter without disclosing to her the import of the document. Between March and July 1997, Ms. Saunders paid Mr. Gaegler $650 to assist her in collecting her money from respondent and made periodic calls to Mr.

---

1. According to the record, respondent borrowed the following:

| | | |
|---|---|---|
| June 13, 1995 | $ | 1500 |
| July 3, 1995 | $ | 1500 |
| August 8, 1995 | $ | 1000 |
| November 14, 1995 | $ | 3000 |
| January 4, 1996 | $ | 3000 |
| January 16, 1996 | $ | 3000 |
| June 12, 1996 | $ | 3000 |
| July 31, 1996 | $ | 300 |
| December 11, 1996 | $ | 5575.11 |
| December 26, 1996 | $ | 5000 |
| **TOTAL** | **$ 26,875.11** | |

Gaegler asking whether he had heard anything from respondent.

On February 18, 1997, the same day that he sent the purported letter from Ms. Saunders to Mr. Gaegler, respondent also filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the District of Columbia. Although at the time he owed Ms. Saunders $26,875.11, plus interest, respondent neither listed her as a creditor nor provided her notice of his bankruptcy filing. Two months later, the bankruptcy petition was dismissed with prejudice based upon respondent's failure to appear at the meeting of creditors and to file a plan, statement, and schedule.

Between February and December 1997, Mr. Gaegler called respondent on numerous occasions to request that he repay Ms. Saunders, and wrote to him requesting that they "work out a solution." On one occasion in which Mr. Gaegler reached him on the phone, respondent did not deny borrowing the money from Ms. Saunders, but "failed and refused" to pay her (with the exception of a few small payments) or to come up with a payment plan. Mr. Gaegler continued writing letters after the telephone conversation, but respondent did not answer them.

Respondent made three small payments to Ms. Saunders: (1) on March 11, 1997, he paid $500 on the November 14, 1995 promissory note and agreed to repay the remaining balance together with accrued interest on that note and the principal and interest due on the other three notes by April 11, 1997; (2) on May 23, 1997, he paid $1000 on the November 14, 1995 promissory note and agreed to repay the remaining balance together with accrued interest on that note and the principal and interest due on the other three notes by August 15, 1997; and (3) on December 2,

1997, he paid $200 on the November 14, 1995 promissory note and agreed to repay the remaining balance with accrued interest on that note and the principal and interest due on the other three notes by February 28, 1998.

In December 1997, respondent closed his law practice, abandoned his house in Washington, D.C., and moved to Georgia. Mr. Gaegler continued to call him requesting that he repay Ms. Saunders, but respondent made no additional payments. He currently owes Ms. Saunders $25,173.11 in principal, plus interest at ten percent from the date of the various loans.

In his answer to the ethical complaint filed by Ms. Saunders's nephew on her behalf, respondent admitted that he had borrowed money from Ms. Saunders as reflected in the four promissory notes attached to her complaint. He also accused Ms. Saunders of committing perjury in the probate matter, and of admitting doing so. But for her perjury, he contended, she would have prevailed on her $80,000 claim against her brother's estate and he could have repaid the loans with the contingency fee he would be owed from representing her in that matter. During the hearing, Ms. Saunders testified that she did not lie to the court and never told respondent that she had done so. The hearing committee credited her testimony, but determined that the question of her alleged perjury was irrelevant to the disposition of the disciplinary charges.

As noted, respondent did not appear for the hearing, either in person or by counsel, nor did he answer the specification of charges or respond to Bar Counsel's post-hearing brief. Respondent filed no exception to the hearing committee's report and recommendation that he be disbarred.[2]

2. During the hearing, a law clerk for Bar

Counsel testified that respondent, who by this

Before this court he contends for the first time that the findings of fact made by the committee and adopted by the Board should be modified to indicate "necessary changes" and "additions" reflecting his version of events. In addition, respondent contends that we should reduce the recommended sanction to "a nominal period of suspension" with reinstatement conditioned only on his repayment of the funds he improperly took from his client. We do not consider his arguments because he has waived them by not presenting them to the Board. *See In re Holdmann*, 834 A.2d 887, 889 (D.C.2003). We turn to consider the competing recommendations of the Board and Bar Counsel.

## II.

## DISCUSSION

■ A sanction recommended by the Board on Professional Responsibility comes to us with a strong presumption in favor of its imposition. *See In re Hutchinson*, 534 A.2d 919, 924 (D.C.1987). We "shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(g). The imposition of sanction in bar discipline cases is not an exact science and may depend on the facts and circumstances of each particular proceeding. *See In re Haupt*, 422 A.2d 768, 771 (D.C.1980) ("Within the limits of the mandate to achieve consistency, each case must be decided on its particular facts."). Generally speaking, if the Board's recommended sanction falls within the wide range of acceptable outcomes, it will be adopted and imposed. "When the court disagrees with

the Board as to the seriousness of the offense or the demands of consistency, however, the Board's recommendations are accordingly granted less weight." *In re Kennedy*, 542 A.2d 1225, 1228 (D.C.1988) (citing *In re Reback*, 513 A.2d 226, 230–31 (D.C.1986) (en banc)). Ultimately, the system of attorney discipline, including the imposition of sanctions, is the responsibility and duty of this court. *See Hutchinson*, 534 A.2d at 924.

■ To determine what discipline is appropriate under the circumstances, we review the respondent's violations in light of "the nature of the violation, the mitigating and aggravating circumstances, the need to protect the public, the courts, and the legal profession," *Hutchinson*, 534 A.2d at 924, and the moral fitness of the attorney. *See Reback*, 513 A.2d at 231 (quoting *In re Smith*, 403 A.2d 296, 303 (D.C.1979)). The purpose of imposing discipline is to serve the public and professional interests identified and to deter similar conduct in the future rather than to punish the attorney. *See Kennedy*, 542 A.2d at 1231; *Hutchinson*, 534 A.2d at 924.

■ What is the appropriate sanction necessarily turns on the nature of the respondent's misconduct. We agree with the findings of the hearing committee and the Board that respondent's actions violated Rule 1.8(a) by engaging in prohibited conflicts of interest and Rule 8.4(c) by engaging in dishonest conduct. The Board departs from the committee's recommendation for disbarment, arguing that the specification of charges did not place respondent on notice that he was being charged with theft and fraud, and that these charges are not supported by clear

---

time had moved to Georgia, acknowledged by telephone on May 10, 2000 that he was aware of the upcoming hearing and had received

Bar Counsel's exhibits, but had not decided whether he would attend the hearing.

and convincing evidence of record. We disagree with the Board in this regard.

The specification charged respondent with violating Rule 8.4(c) by engaging in "conduct involving dishonesty, fraud, deceit, and/or misrepresentation." The Board contends, however, that the specific acts of dishonesty identified by Bar Counsel were limited to respondent's writing of the letter to Mr. Gaegler on behalf of Ms. Saunders and failing to include her as a creditor in his bankruptcy proceedings. We think that is too limited a reading of the specification. Bar Counsel alleged facts which specifically support her claim that respondent's acts of dishonesty involved fraudulent conduct, including the repeated abuse of the lawyer-client relationship through conflicted transactions with a particularly vulnerable client. Moreover, Bar Counsel's post-hearing brief clearly indicates that respondent engaged in acts that amounted to theft and fraud. Notably, respondent did not object to the facts as stated by Bar Counsel or file any exception with the Board, nor did he ask for a bill of particulars on these charges. Although "an attorney can be sanctioned only for those disciplinary violations enumerated in formal charges," *In re Smith*, 403 A.2d at 300, we agree with Bar Counsel that the specification of charges and post-hearing filings fairly put respondent on notice of the fraud charges against him. *See In re Hager*, 812 A.2d 904, 917 n. 14 (D.C.2002) ("Although client's continuing right to sue was not specifically mentioned [in the specification of charges], [the court] believes that Bar Counsel's highlighting the Settlement Agreement sufficiently alerted respondent that the entire Agreement would be subject to scrutiny for ethical violations.") (citing, *inter alia, In re Slattery*, 767 A.2d 203, 208–09 (D.C.2001) (finding that respondent was fairly put on notice of the charges against him, including theft by trick and theft by conversion and misappropriation, even though the specification made no explicit mention of Bar Counsel's specific theory of theft)).

Turning to whether the finding that respondent's conduct was fraudulent is supported by clear and convincing evidence, Rule 8.4(c) provides that "[i]t is professional misconduct for a lawyer to ... engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." We have previously stated that "dishonesty" includes "fraudulent, deceitful, or misrepresentative behavior." *In re Shorter*, 570 A.2d 760, 767–68 (D.C.1990) (per curiam). In *Shorter*, we noted that "fraud" is a "generic term which embraces all the multifarious means ... resorted to by one individual to gain advantage over another by false suggestions or by suppression of the truth." 570 A.2d at 767 n. 12 (quoting 37 C.J.S. *Fraud* § 1 (1943)). Bar Counsel contends that respondent's conduct over a period of eighteen months in taking advantage of a vulnerable, uneducated client of very limited means to obtain a series of ten loans totaling approximately $27,000, on terms that were more disadvantageous to her than a loan he had procured (and benefited from) on her behalf, and then continuing to borrow more money from her while failing to make payment on the initial notes, falls within the definition of "fraud." We concur. A review of the record shows that respondent suggested to Ms. Saunders that she should obtain a reverse mortgage in order to pay for the litigation expenses associated with bringing a claim against her brother's estate. Although Ms. Saunders testified that she didn't remember asking respondent to help her obtain the loan, he did so under terms calling for twenty percent interest. At closing, Ms. Saunders received $7,274.34. Knowing that his client had recently closed on the reverse mortgage, respondent approached her to borrow money in order to save his

house from foreclosure. In doing so, respondent dictated the terms of the loans, providing no collateral or security, and prepared non-negotiable promissory notes payable on a date certain with interest at the rate of ten percent per annum. Respondent failed to make payments pursuant to the terms of the initial loans, and yet continued to borrow money from his client under similarly exploitative terms. After having the benefit of her testimony, the hearing committee found that "it is amply clear that [Ms. Saunders] did not fully comprehend the nature (and certainly not the risk) of what she was agreeing to." Furthermore, the hearing committee found that respondent either knew, or should have known, that his current financial situation would not allow him to repay Ms. Saunders on the dates provided by the notes, and that he was aware of her precarious financial situation.

 The Board contends, however, that respondent recognized his debt to Ms. Saunders and intended to repay her, and that he did so whenever he was financially able. While it is true that respondent made three small payments in 1997 totaling $1,700, the record shows that he did so only after receiving multiple communications from Ms. Saunders's attorney requesting payment on the loans. He has made no further attempts to repay his client, and currently owes Ms. Saunders $25,175.11 in principal, plus ten percent interest. In addition, the hearing committee found that respondent's acts of dishonesty continued as he tried to "thwart Ms. Saunders' single effort to protect her own interests when he drafted, typed and sent a letter to Mr. Gaegler discharging him as Ms. Saunders' attorney, and falsely stating that he and Ms. Saunders had resolved their 'differences.'" We are bound—as is

the Board—by the hearing committee's finding of fact. *See In re Kitchings,* 779 A.2d 926, 933 (D.C.2001). Finally, respondent's failure to include Ms. Saunders as a creditor in his bankruptcy petition further demonstrates that he did not recognize his responsibility to meet his financial obligations to Ms. Saunders. As a result, we conclude that the record supports a finding by clear and convincing evidence that respondent engaged in fraudulent acts of dishonesty.

The Board, as we have noted, has recommended an eighteen-month suspension with a requirement of a showing of fitness, rejecting the hearing committee's recommendation for disbarment. The Board's position is grounded on its contention that the specification of charges did not provide respondent notice that he was facing charges of dishonesty including fraudulent acts and because there was insufficient evidence that respondent had an intent to permanently deprive Ms. Saunders of her funds. As a result, the Board views this case as involving primarily a conflict of interest with related acts of dishonesty, which calls for a sanction of suspension similar to that imposed in other conflict of interest cases. *See In re Jones–Terrell,* 712 A.2d 496, 502 (D.C.1998).[3] Given our conclusion that respondent had sufficient notice of the fraud charges pending against him, and that his actions over an extended period of time support by clear and convincing evidence the hearing committee's findings that respondent engaged in repeated fraudulent acts of dishonesty that deprived his client of needed funds, the Board's recommended sanction does not reflect the seriousness of respondent's acts and the impact of his actions on his client. The Board does not contest that disbarment is appropriate in cases of

**3.** The Board also relies on *In re McLain,* 671 A.2d 951 (D.C.1996). In that case, however, the hearing committee had found insufficient

evidence of deceit, and based a 90–day suspension solely on the attorney's conflict of interest.

fraudulent taking of funds. *See In re Gil,* 656 A.2d 303, 306 (D.C.1995); *In re Pierson,* 690 A.2d 941, 951 (D.C.1997); *In re Viehe,* 762 A.2d 542, 544 (D.C.2000); *In re Slattery,* 767 A.2d at 219. Therefore, we agree with Bar Counsel that, even if, as it appears, respondent is no longer practicing law here, a sanction of disbarment appropriately conveys that such "deliberate and continuing" misconduct directed at a vulnerable client will not be tolerated in this jurisdiction.

Finally, we agree with the Board's recommendation that full restitution should be made to Ms. Saunders and to the Clients' Security Trust Fund before respondent is eligible to apply for re-admission.[4] We disagree, however, that in making restitution to Ms. Saunders interest should be assessed at the legal rate, *i.e.,* six percent, rather than the ten percent rate respondent agreed to pay in his promissory notes to Ms. Saunders. As respondent has admitted that he borrowed the money at the stated terms, we can conceive of no persuasive reason why he should not be required to pay what he promised to the client of whom he took unfair advantage. Interest on the amount due to the Clients' Security Trust Fund should be at the legal rate.

ORDERED that Eugene T. Austin be, and hereby is, disbarred, and it is;

FURTHER ORDERED that respondent's attention is drawn to the requirement of full restitution as a condition precedent to applying for re-admission to the Bar as set forth in this opinion.

*So ordered.*

---

4. The record shows that the Clients' Security Trust Fund has reimbursed Ms. Saunders for the unpaid principal amount of the loan ($25,175.11) and for the fees that she paid respondent ($4,195).