**In re Maryrose O. NWADIKE, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 455695).**

**No. 04–BG–995.**

District of Columbia Court of Appeals.

Argued Oct. 6, 2005.

Decided Aug. 10, 2006.

trial court's *parens patriae* obligation, and that          concerning the Jencks Act.

Elizabeth A. Herman, Senior Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel, was on the brief, for the Office of Bar Counsel.

Katherine S. Gruenheck, Counsel, with whom Elizabeth J. Branda, Executive Attorney, was on the brief, for the Board on Professional Responsibility.

John O. Iweanoge, Jr., Washington, DC, for the respondent.

Before GLICKMAN and KRAMER, Associate Judges, and PRYOR, Senior Judge.

KRAMER, Associate Judge:

The Board on Professional Responsibility ("Board") has recommended that the respondent, attorney Maryrose Nwadike, be sanctioned by informal admonition for violating D.C. Rule of Professional Conduct 1.1(b), requiring an attorney to "serve a client with skill and care commensurate with that generally afforded to clients by other lawyers in similar matters." District of Columbia Office of Bar Counsel ("Bar Counsel") has filed an exception to the Board's order, claiming that the proper sanction for this violation is a thirty-day suspension, rather than an informal admonition, and that an informal admonition would foster a tendency toward inconsistent dispositions for comparable conduct. Ms. Nwadike has filed no exception to the Board's order. We agree with the Board and adopt its recommended sanction.

## I.

The facts underlying this matter are

essentially undisputed.[1] The matter arises from a medical malpractice case that was referred to Ms. Nwadike, a sole practitioner, in August 1995, from a law firm well-known for handling such matters. The claims involved had resulted from a botched intravenous infusion given at Children's Hospital that burned and left a scar on the arm of Magnus Dada, a newborn baby boy. The referring law firm had represented Magnus' parents, Anthony and Bisi Dada, in connection with this matter and had pursued claims for both Magnus and his mother, who was seeking wages lost as a result of Magnus' injuries. The firm had compiled information regarding the Dadas' claims, including medical records, opinions about Magnus' injury and the names of three potential expert witnesses, one of whom had estimated the cost of corrective surgery for Magnus at $1,100. The firm had begun settlement negotiations with Children's Hospital, and had received a $5,000 settlement offer along with an indication from the hospital's counsel that it would be willing to go as high as $10,000 in order to resolve the matter.

In the course of discussions, the referring attorney informed Ms. Nwadike about the Dadas' claims and the most recent settlement offer, suggesting that a settlement greater than $10,000 might be possible if a lawsuit was filed. In that connection, he told Ms. Nwadike that the statute of limitations would expire in November 1995. He also mentioned that the firm was referring the case to her because it was too small for the firm to handle and because it was thought that her Nigerian background would be of benefit in working with the Dadas, who were also from Nigeria.

Shortly after receiving the referral, Ms. Nwadike met with Mr. Dada to discuss the case and review the retainer agreement. Ms. Nwadike made clear that settlement was the best resolution, and that she might not be able to continue the representation if the matter went to trial. She also explained the imminent expiration of the statute of limitations, requiring the complaint to be filed within three months of their conversation. The retainer agreement Ms. Nwadike presented provided that the Dadas would pay all of the costs of litigation. Mr. Dada signed the retainer agreement, but since Mrs. Dada was to be a named party in the suit, Ms. Nwadike wanted her signature on the agreement as well. Mr. Dada, however, insisted that he "was in charge," and that his wife's signature was unnecessary. Ms. Nwadike was never able to obtain Mrs. Dada's signature on the agreement.

On November 9, 1995, to avoid missing the deadline for the expiration of the statute of limitations, Ms. Nwadike filed a complaint in the Superior Court, paying all the fees herself. Children's Hospital then served upon her interrogatories and medical release forms, which Ms. Nwadike mailed to the Dadas on December 12, 1995, after trying unsuccessfully to contact them. Mrs. Dada immediately returned the medical release form, though not the responses to the interrogatories. Despite continued efforts, Ms. Nwadike was unable to contact the Dadas from December 1995 through early Spring 1996. As a result, she was unable to respond to the hospital's interrogatories. Sometime in the spring of 1996, she re-established contact with the Dadas and on May 3, 1996, obtained their responses to the interrogatories, though they were several months late.

---

1. While Bar Counsel claims that the Board's factual findings are "incomplete and misleading," this argument is actually a challenge to the Board's legal conclusions, not the underlying facts, and are discussed herein at 227–229, *infra*.

In the meantime, despite her inability to contact the Dadas, Ms. Nwadike had continued working on the case and had been seeking to secure expert witnesses. The referring law firm had provided her with the names of three potential witnesses, including Dr. Poku–Dankwah ("Dr. Poku"), the Dadas' family physician and a potential expert witness. Ms. Nwadike called and met with Dr. Poku in early 1996, giving him the case file so that he could prepare his expert statement. At that meeting, after quickly reviewing the case, with which he was already somewhat familiar due to his regular treatment of Magnus Dada, Dr. Poku told Ms. Nwadike that it was his opinion that the standard of care had been breached by Children's Hospital. Thus, Ms. Nwadike believed that she had secured an expert witness and asked him to complete a statement concerning what the substance of his testimony would be if he was called as a witness at trial. Despite her urging over the next several months, Dr. Poku never completed the statement.

The trial court's scheduling order required that the plaintiff's Rule 26(b)(4) statement, listing the potential experts to be called at trial and setting forth a summary of their expected testimony, be filed by May 23, 1996. Just prior to this due date, Ms. Nwadike had requested that the Dadas seek new counsel and they agreed to, but did not do so. After discovering that her clients had not secured new legal representation, Ms. Nwadike drafted and filed the requisite Rule 26(b)(4) statement on June 27, 1996, over a month beyond the May 23, 1996 due date provided in the court's scheduling order. The Rule 26(b)(4) statement listed Dr. Poku, as well as two other doctors that had been sug-

gested by the referring law firm, as potential expert witnesses. The substance of their expected testimony, however, was not provided. Rather, Ms. Nwadike wrote: "Plaintiff has not yet decided on whom to call as expert witnesses, at this time. When she does, she will supplement this answer." Ms. Nwadike later testified that of the three people listed, she had only contacted Dr. Poku, whom she anticipated using at trial as her expert witness.

Sometime in June 1996, Ms. Nwadike learned of a complaint letter that the Dadas had sent to their insurance company regarding Dr. Poku.[2] She met with the Dadas and urged them not to pursue their complaint against Dr. Poku, since he was the expert in their lawsuit against Children's Hospital, and it would be difficult for the Dadas to find another doctor who was directly familiar with the facts, believed there had been a breach of the standard of care and was affordable. Mr. Dada, however, took the position that Dr. Poku was not a suitable expert for their case, and that they would be able to find a replacement. Nonetheless, at the end of the meeting, Ms. Nwadike believed that she had convinced the Dadas not to pursue their complaint against Dr. Poku.

Around this same time, Children's Hospital attempted to schedule depositions of the experts and plaintiffs in the case. The Dadas were deposed, but when the hospital attempted to get depositions of the experts listed in the plaintiffs' Rule 26(b)(4) statement, it discovered that none was willing to testify on the Dadas' behalf. The hospital obtained affidavits to that effect from each of the three purported experts and used them as the basis of its motion for summary judgment, filed on August 23, 1996. Ms. Nwadike first

---

**2.** Mrs. Dada testified before the Hearing Committee that she became pregnant in early 1996 and suffered a miscarriage, which she

believed was due in part to Dr. Poku's treatment.

learned that Dr. Poku was refusing to appear as an expert witness for the Dadas from the hospital's motion.[3]

Ms. Nwadike filed an opposition to the motion for summary judgment, arguing that an expert was not necessary to show the standard of care. Concurrently, she filed a motion for leave to extend the time for discovery an additional thirty-days to give her time to locate another expert. On September 9, 1996, the trial court granted the hospital's motion for summary judgment, dismissing the case with prejudice. The court did not address the motion to extend discovery.

On September 21, 1996, Ms. Nwadike filed a motion to reconsider the grant of summary judgment, explaining that she had been surprised by Dr. Poku's affidavit that was submitted by Children's Hospital in support of its motion for summary judgment and his refusal to act as the Dada's expert witness. She immediately began a search for another expert and located a nurse practitioner who had testified as an expert in a previous medical malpractice trial on which Ms. Nwadike had worked. The nurse agreed to provide an affidavit in support of the Dadas' case for a fee of $2,000, which Ms. Nwadike paid from her own funds. That affidavit was included with the motion for reconsideration. The trial court scheduled a hearing on the motion ("reconsideration hearing") for November 1, 1996, at 10:30 a.m.

On the morning of November 1, Ms. Nwadike went to her own doctor's office for a routine appointment prior to the hearing. The exam revealed that Ms. Nwadike had an ectopic pregnancy that was life threatening and required immediate surgery. By then, it was past 10:30 a.m., the time set for the reconsideration hearing. Ms. Nwadike refused to have the surgery and instead rushed to court after calling the judge's chambers to inform them that she would be late but was on her way. Upon reaching the courthouse, Ms. Nwadike had difficulty locating the courtroom, since it had been changed due to ongoing renovations. By the time she found it, the trial judge had signed an order denying the motion for reconsideration of the grant of summary judgment because of Ms. Nwadike's failure to appear at the hearing.

Later that day, Ms. Nwadike went to the hospital and had the necessary surgery. After her recovery, during which she did no legal work, she filed a notice of appeal from the trial court's denial of her motion to reconsider the grant of summary judgment, paying the filing costs herself. In her appellate brief, she argued that the affidavits from the expert witnesses had come as a complete surprise to her and that they constituted "newly discovered facts." *Dada v. Children's Nat'l Med. Ctr.*, 715 A.2d 904, 906 (D.C.1998) ("*Dada I*"). Thereafter, she withdrew as the Dadas' counsel and forwarded her files to a new attorney.

This court heard the Dadas' appeal in *Dada I* and ruled that a remand was necessary in order for the trial court to consider the motion for leave to extend time for discovery. *Id.* at 905, 911. In *Dada I*, we wrote:

---

3. Ms. Nwadike's expectation that Dr. Poku would be willing to testify as an expert witness was solidly based. As Bar Counsel notes, he testified at the February 11, 1999 remand hearing before Judge Huvelle: "I think I committed to be the expert witness.... [Ms. Nwadike] knew that I was going to support her. I was going to testify—I was going to support her case. As for that, she definitely knew." His change of heart was apparently the result of a second complaint letter that the Dadas had filed against him.

[T]he relationship between appellant's pending discovery motion and appellee's motion for summary judgment was apparent. Because the ruling on the discovery motion in all likelihood would have determined the outcome of the motion for summary judgment, the trial court erred by failing to rule on the former before granting summary judgment.

*Id.* at 907. In order to prevail, we noted, the Dadas had to show "good cause for modification of the court's scheduling order" to extend the time for discovery, and that the "failure to act in timely fashion was due to excusable neglect." *Id.* at 908, 910.

On February 11, 1999, the trial court held a remand hearing to address the issues specified in *Dada I.* The Dadas were represented at the remand hearing by new counsel. All three doctors who had been listed in the Rule 26(b)(4) statement testified, as well as Ms. Nwadike herself. Her testimony largely centered on how much she knew about the experts that she had identified in her Rule 26(b)(4) statement. She was not asked and did not testify about the health problems that she had encountered on the day of the reconsideration hearing nor about the difficult relationship she had experienced with her clients. At the conclusion of the remand hearing, the trial court denied the motion to extend discovery, concluding that there was no good cause to modify the scheduling order, nor was the neglect excusable.[4] On appeal, we affirmed the trial court's decision that "it was not an abuse of discretion for the trial judge to rule that, 'the conduct of the prior counsel [was] totally disingenuous. She ... clearly and inten-

tionally mislead this [c]ourt and the defense counsel on more than one occasion....'" *Dada v. Children's Nat'l Med. Ctr.,* 763 A.2d 1113, 1116–1117 (D.C.2000) (*"Dada II"*).

## II.

In December 2001, Bar Counsel instituted disciplinary proceedings against Ms. Nwadike with the Board on Professional Responsibility. Specifically, Bar Counsel charged that, in Ms. Nwadike's representation of the Dadas, she had violated Rules of Professional Conduct 1.1(a) (failure to provide competent representation), 1.1(b) (failure to represent with skill and care), 1.3(a) (failure to represent with diligence and zeal), 1.3(b) (failure to seek client's lawful objectives) and 1.16(a) (failure to withdraw from representation). Ms. Nwadike, through counsel, filed an answer denying that her conduct as alleged by Bar Counsel constituted a violation of the Rules.

A hearing was held before a Board Hearing Committee. Anthony Dada, Bisi Dada and Ms. Nwadike testified. Mr. Dada's testimony revealed that Ms. Nwadike had never been compensated for her representation of his son and wife but had personally paid all of the fees associated with filing the pleadings and securing experts. Mrs. Dada testified primarily about complaints that she had filed against Dr. Poku. Ms. Nwadike testified for the first time about the difficulties she had encountered in representing the Dadas, as well as about her personal health problems. At the close of evidence, the Hearing Committee issued its Report and Recommenda-

---

4. In doing so, the trial court condemned Ms. Nwadike's conduct as "reprehensible," holding that "there [was] no reasonable basis offered for [respondent's] noncompliance [with the court's scheduling order] other than her own failure to comply with her obligations as a lawyer and to act diligently. There is no good faith here." She also suggested that the Dadas had some legal recourse against Ms. Nwadike.

tion, finding that Ms. Nwadike did not violate any of the Rules of Professional Conduct cited by Bar Counsel, and that the complaint should be dismissed. Bar Counsel subsequently filed an exception with the Board.

The Board disagreed with the Hearing Committee's recommendation of dismissal. After reviewing the facts, which they adopted from the Hearing Committee's findings "with minor changes," the Board determined that Ms. Nwadike had violated Rule 1.1(b) in her failure to file a timely and complete Rule 26(b)(4) statement. The Board then asked Bar Counsel and Ms. Nwadike to present any aggravating or mitigating circumstances that might be relevant to a determination of an appropriate sanction. Bar Counsel provided no aggravating circumstances. Ms. Nwadike presented as mitigating circumstances her medical treatment, her clients' uncooperative conduct and her efforts to correct her mistakes. The Board issued its order thereafter, directing Bar Counsel to informally admonish Ms. Nwadike for her violation of Rule 1.1(b).

### III.

Bar Counsel has filed an exception to the Board's order directing an informal admonition, seeking instead the sanction of a thirty-day suspension, contending that the Board failed to consider certain "crucial findings that put [Ms. Nwadike's] misconduct in context, show[ed] the seriousness of the prejudice to [her] clients and demonstrate[d] the gravity of [her] failures." Bar Counsel specifically argues: (1) Ms. Nwadike's ignorance of the relevant statute of limitations, (2) her failure to inform the trial court at the time of the *Dada I* remand hearing of her personal health reasons for missing the November 1, 1996 hearing and (3) her multiple shortcomings—apart from the Rule 26(b)(4) statement—in handling her discovery obligations. Bar Counsel also argues that the Board's recommended sanction of an informal admonition is improper, since it "would foster a tendency toward inconsistent dispositions." For the reasons stated below, we conclude that the Board's decision not to consider the additional factors pointed to by Bar Counsel was well within its discretion, and that imposing an informal admonition in this case is in line with comparable professional disciplinary sanctions.

### A.

We "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record," D.C. Bar Rule XI, § 9(g)(1), although we review the Board's legal determinations *de novo*. See *In re Harkins*, 899 A.2d 755, 758 (D.C.2006); *In re Soininen*, 853 A.2d 712, 724 (D.C.2004). Here, there is no dispute that the factual findings are supported by the record. Rather, the Board and Bar Counsel disagree on the appropriate sanction that should be imposed.

Although we recognize that "the responsibility for imposing sanctions rests with this court in the first instance," *Soininen, supra*, 853 A.2d at 723 (quoting *In re Temple*, 629 A.2d 1203, 1207 (D.C.1993)); see *In re Sims*, 844 A.2d 353, 360 (D.C. 2004), a sanction recommended by the Board "comes to the court with a strong presumption in favor of its imposition." *In re Schoeneman*, 891 A.2d 279, 281 (D.C. 2006) (quoting *Soininen, supra*, 853 A.2d at 723). "[I]f the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed." *Soininen, supra*, 853 A.2d at 723 (quoting *In re Hallmark*, 831 A.2d 366, 371 (D.C.2003)); see *In re Bailey*, 883 A.2d 106, 115 (D.C.2005). Indeed, D.C. Bar R. XI, § 9(g)(1) provides that the court "shall

adopt the recommended disposition of the Board unless to so do would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted."

## B.

■ Before turning to the question of whether the specific sanction recommended "would foster a tendency toward inconsistent dispositions," we consider Bar Counsel's concern that in determining the proper sanction, the Board failed to give proper weight to all of the evidence of Ms. Nwadike's shortcomings. We begin with the harm allegedly suffered by the Dadas as a result of Ms. Nwadike's ignorance that the statute of limitations for Magnus Dada's claim would be tolled under D.C.Code § 12–302(a) because he was under the age of eighteen.[5] Bar Counsel argues that, by not explaining this to the Dadas, she in effect led them to prematurely file their complaint, which was especially prejudicial to them because they were not financially able to properly pursue their claim at this time. The record provides no support, however, for the position that the Dadas would have wished to postpone the filing of their complaint on this basis. Indeed, the statute of limitations for the intertwined wage loss claim of Mrs. Dada would not have been tolled, since she was clearly not under the age of eighteen. *See* note 5, *supra.* Moreover, the discussions Ms. Nwadike had with referring counsel and with Mr. Dada at the beginning of the representation show that the filing of the complaint was intended primarily as a settlement tool deemed vital to the negotiations with Children's Hospi-

tal—a tool that was only available if the complaint was actually filed. Thus, there is no record support for the position that the Dadas were rushed into filing suit based on Ms. Nwadike's ignorance of the statute of limitations, and her ignorance should have no effect on the sanction imposed.

Second, Bar Counsel argues that the Board did not consider the prejudice to the Dadas caused by Ms. Nwadike's failure to inform the trial court at the remand hearing why she was late to the November 1, 1996 hearing on the motion for reconsideration. But Ms. Nwadike's tardy arrival at the reconsideration hearing was not at issue at the time of the remand hearing—a hearing held after the Dadas had hired new counsel. Rather, in accordance with our directions in *Dada I*, the purpose of this remand hearing was for the trial court to consider the motion for leave to extend time for discovery. Thus, when Ms. Nwadike testified at the remand hearing, she, quite appropriately, addressed only the issues she was questioned about—her difficulties with Dr. Poku and how, at the time of her response to the motion for summary judgment, she was unaware that he was no longer willing to act as an expert witness for the Dadas. It was before the Hearing Committee, after Bar Counsel had filed charges against her, that Ms. Nwadike's medical problems that caused her to arrive late to the reconsideration hearing (as well as her difficult attorney-client relationship with the Dadas) were first divulged. The Board considered this testimony, along with the harm caused to the Dadas (the dismissal of their case with prejudice), in determining the

---

**5.** D.C.Code § 12–302(a) (2001), specifies:
[W]hen a person entitled to maintain an action is, at the time the right of action accrues:
   (1) under 18 years of age; or

   (2) non compos mentis; or
   (3) imprisoned—
he or his proper representative may bring action within the time limited after the disability is removed.

appropriate sanction. Thus, we find Bar Counsel's argument on this point unpersuasive.

Third, Bar Counsel argues that the Board focused solely on Ms. Nwadike's failure to file a timely and adequate Rule 26(b)(4) statement and improperly ignored Ms. Nwadike's other shortcomings in her representation, particularly her failure to comply with court-imposed deadlines for the production of documents and responses to interrogatories. In support of its position, Bar Counsel relies extensively on language from the trial court's decision on remand denying the motion to reconsider the motion for leave to extend time for discovery, as well as on language from our opinion in *Dada II*. Not only were the proceedings before the Hearing Committee the first time that all of the circumstances surrounding this representation came to light, but the focus on the Rule 26(b)(4) statement, rather than the allegations of the other discovery lapses, was because Bar Counsel rested its Rule 1.1(b) charge on the deficient and late Rule 26(b)(4) statement alone. The "pattern" of discovery lapses raised by Bar Counsel before the Board related to the Rule 1.1(a) charge, which was dismissed by the Board without exception being taken. Thus, the Board, which was fully informed of the various other discovery issues, specifically chose not to take them into account in reaching its decision and found that, although the "[r]espondent's representation was lacking in some respects, [r]espondent went above and beyond the call of duty in other respects." Accordingly, the record does not support Bar Counsel's position that the Board inappropriately failed to consider the extent of Ms. Nwadike's shortcomings in her representation of the Dadas in determining the appropriate sanction. We now turn to the issue of whether an informal admonition, as recommended by the Board, would "foster a tendency toward inconsistent dispositions for comparable conduct."

## C.

■ We have referred to an informal admonition, recommended by the Board in this case, as the "least severe of the available sanctions." *In re Gonzalez*, 773 A.2d 1026, 1032 (D.C.2001); *see In re Williams*, 693 A.2d 327, 329 (D.C.1997). Bar Counsel contends that a thirty-day suspension is more in line with the sanctions imposed in other cases. Thus, we are presented with an issue of the comparability of cases that, on the one hand have imposed an informal admonition, and on the other hand have imposed a thirty-day suspension.

■ "When determining the consistency of sanctions between cases, it is necessary to compare the gravity and frequency of the misconduct, any prior discipline, and any mitigating factors...." *In re Schlemmer*, 840 A.2d 657, 660 (D.C. 2004) (quoting *In re Slattery*, 767 A.2d 203, 215 (D.C.2001)) (internal quotations omitted). Furthermore, in determining which sanction is appropriate, we review "the nature of the violation, the mitigating and aggravating circumstances, the need to protect the public, the courts, and the legal profession, and the moral fitness of the attorney." *In re Austin*, 858 A.2d 969, 975 (D.C.2004) (citing *In re Hutchinson*, 534 A.2d 919, 924 (D.C.1987); *In re Reback*, 513 A.2d 226, 231 (D.C.1986) (en banc)) (citations and internal quotations omitted); *see In re Brown*, 851 A.2d 1278, 1279–1280 (D.C.2004). The purpose of imposing sanctions is not to punish the violating attorney, but to "serve the public and professional interests identified and to deter similar conduct in the future...." *Austin, supra*, 858 A.2d at 975.

As a beginning point, the Board recognizes that Ms. Nwadike has no disciplinary

history; nor is there any evidence that her deficiencies were either intentional or involved dishonesty. Further, the Board notes that there appear to be no previous disciplinary cases involving a single violation of Rule 1.1(b), and that the most analogous cases are those involving Rule 1.1 violations in combination with violations of other rules. The cases deemed most comparable by the Board are *In re Uriarte,* BDN 380–02 (BC May 30, 2003), *In re Cohen,* BDN 042–98 (BC Mar. 4, 2003), and *In re Hill,* 619 A.2d 936 (D.C.1993), all of which involve failures in connection with appeals, which is somewhat analogous to the failure to file a proper Rule 26(b)(4) statement.

*In re Hill* involved an attorney's failure to file a brief after being appointed to represent an incarcerated client in his appeal from a criminal conviction. 619 A.2d at 937. When the attorney failed to file the brief, a show cause order was issued, and the attorney was granted an extension of time to do so. Further extensions were also granted, but the attorney did not meet the new deadlines, failing to respond at all. *Id.* at 937–938. As a result, his appointment was vacated and the matter referred to Bar Counsel. *Id.* at 938. Over the period of a year, the attorney failed to respond to any of four letters sent to him by Bar Counsel seeking a response to the allegations of unethical conduct, nor to a fifth sent him by the Board. *Id.* at 938. The Hearing Committee found that he was in violation of the Rule of Professional Conduct requiring an attorney to respond to court orders and requests from Bar Counsel, and that he had failed to fulfill his obligations as an attorney. It recommended that he be sanctioned by informal admonition. In reviewing the case, the Board noted that he had no prior disciplinary history and that the harm to his client, other than a five-month delay, was unclear. While the Board found that he was negli-

gent, it did not find pervasive negligence. Based on his lack of cooperation with Bar Counsel, however, the Board concluded that an informal admonition was insufficient and instead recommended public censure, which we adopted. *Id.* at 937, 939–940. Thus, in *Hill,* the attorney was clearly negligent (indeed, it would appear wilfully so) and then failed to cooperate with Bar Counsel—more serious circumstances than what occurred in Ms. Nwadike's case.

The attorney in *Uriarte* represented a client in connection with a political asylum claim. BDN 380–02 at 2. After a hearing, at which the client was denied asylum, the attorney agreed to handle the appeal and filed a timely notice. He then failed to respond to an INS pleading, and, being given written notice of the deadline for filing the brief and that failure to file could result in the summary dismissal of the appeal, he missed the deadline, resulting in dismissal of the appeal. *Id.* at 2–3. The attorney blamed his failure on a bookkeeping error in his office. *Id.* at 1–2. Bar Counsel determined that the respondent's conduct violated Rules 1.1(a) (competence), 1.1(b) (skill and care), 1.3(a) (diligence and zeal) and 1.4(b) (explaining matters to client) and issued an informal admonition. *Id.* at 3–5. These violations were more numerous and more serious than Ms. Nwadike's misconduct; although she filed the Rule 26(b)(4) statement late and incomplete, she did not ignore or overlook the need to file one.

*In re Cohen* also involved the representation of a client seeking political asylum. BDN 042–98 at 3. The attorney first failed to obtain adequate translations and certifications of necessary documents, which precluded their admission into evidence. *Id.* After the hearing, at which asylum was denied, the attorney then misinformed her client with respect to the proper next step and filed a motion for reconsideration of

the immigration judge's denial, failing to understand that the only action that would stay the deportation order was the filing of an appeal, which she did not do. *Id.* at 6–7. Bar Counsel determined that, while the attorney had filed a motion to reconsider as a first step towards filing an appeal, this was not the proper procedure by which to stay a deportation order in the immigration court. *Id.* at 3–5. The attorney was found to have violated Rules 1.1(a) (competence), 1.1(b) (skill and care) and 1.4(b) (explaining matters to client) and received an informal admonition. This case is the most closely analogous of the three cited by the Board, since it involves what appears to be good faith errors that can be analogized to Ms. Nwadike's late filing of the incomplete Rule 26(b)(4) statement.[6]

Bar Counsel relies upon *In re Bernstein,* 707 A.2d 371 (D.C.1998), in arguing for a thirty-day suspension rather than an informal admonition. In *Bernstein,* the attorney was found to have violated Rules 1.3(a) (diligence and zeal), 1.3(c) (promptness), 1.4(a) (keeping client reasonably informed),

1.4(b) (explaining matters to client) and 1.16(d) (failing to return client's papers). The attorney was hired to represent clients who had sustained injuries in an automobile accident. Although the attorney filed suit against State Farm Insurance Company, he failed to pursue his clients' claim for over five years, resulting in the dismissal of the case. Before the dismissal, State Farm had conveyed a settlement offer to the attorney, but the attorney never communicated it to his clients. The clients ultimately discharged him and asked for the return of their files, but he refused to grant that request. About the same time as these events were occurring, the attorney was experiencing personal difficulties, including his wife's severe illness and their subsequent divorce. During the disciplinary proceedings, no other mitigating factors were present, such as voluntary compensation to his clients, acknowledgment that he had committed misconduct, nor any remorse for his actions. Indeed, the respondent described the Board as having a "moral numbness as regards mitigating circum-

---

**6.** Although not relied on by the Board or Bar Counsel, additional cases appear to also be relevant to our analysis of comparable cases. For instance, *In re Schlemmer,* 840 A.2d 657, 661–664 (D.C.2004), involved a remand to the Board to consider informal admonition, instead of a public censure, where respondent had failed to file an appeal when his client requested he do so and had not informed his client of the non-appeal, thereby violating Rules 1.3(a) (diligence and zeal) and 1.4(a) (keeping client reasonably informed). On appeal from remand, however, we adopted the Board's new recommendation that the respondent be reprimanded. *In re Schlemmer,* 870 A.2d 76, 76–77 (D.C.2005). *See also In re Sofaer,* 728 A.2d 625, 652–653 (D.C.1999) (informal admonition where attorney violated Rule 1.11(a) (involvement in representation substantially related to previous employment as a public officer or employee), noting that although there was "no comparable Rule 1.11(a) case to use as a parallel for purposes of assessing consistent discipline, [we were]

confident that an informal admonition [was] appropriate"); *In re Payne,* BDN 2005–D174, 3 (BC Sept. 1, 2005) (informal admonition where respondent withdrew from representing a client without alerting the court but mitigated his sanction by cooperating in the investigation and attempting to preserve his client's rights); *In re Jenkins,* BDN 191–99, 3–4 (BC June 16, 2005) (informal admonition for violation of Rules 1.1(a) (competence) and 1.3(c) (promptness) where respondent failed to make several filings in the course of pursuing a civil complaint but where he mitigated his sanction by settling the malpractice claim brought against him and giving up his solo practice); *In re Allen,* BDN 234–96, 2–3 (BC May 7, 2001) (informal admonition where the attorney negligently failed to appear at a hearing and then failed to appeal the dismissal of his client's case, thereby violating Rules 1.3(a) (diligence and zeal), 1.4(a) (keeping client reasonably informed) and 1.4(b) (explaining matters to client)).

stances." The Board determined that he had violated Rules 1.3(a), 1.3(c), 1.4(a), 1.4(b) and 1.16(d), and sanctioned him with a thirty-day suspension. We affirmed that decision.

There would appear to be no significant comparability between Ms. Nwadike's case and *Bernstein*. As the Board points out, this case involves a single violation for lack of skill and care in a single client representation over a short period of time where there is no prior history of discipline. Moreover, there are mitigating factors, one of which is the lack of cooperation of the clients. Although the retainer agreement made clear that it was the Dadas' responsibility to pay the costs of the litigation, they did not honor that agreement but rather caused their counsel to advance the costs, requiring counsel to make substantial out-of-pocket expenditures that were never reimbursed. Furthermore, they were impossible to contact for lengthy periods including when answers to discovery were due and ignored counsel's request that they obtain new representation.

Apart from the client difficulties, other factors outside of Ms. Nwadike's control also contributed to the dismissal of this case. First, the trial judge failed to rule on the motion to extend time for discovery that Ms. Nwadike had submitted in conjunction with her opposition to summary judgment and that might have lead to a postponement of a ruling on summary judgment. Second, had counsel not had a life-threatening emergency that delayed her arrival in court on the day of the reconsideration hearing, the motion for reconsideration of summary judgment might have been granted. Finally, had new counsel elicited testimony from Ms. Nwadike about her medical problem at the remand hearing, the explanation for her tardiness at the reconsideration hearing would have been brought to the trial court's attention and might have affected the court's ruling. As the Board points out, "the record here demonstrates the actions of an attorney who did everything she knew to do, in the manner in which she was able." Indeed, the record shows that Ms. Nwadike put forth significant effort in the course of representing the Dadas, including bearing the expenses of the litigation and insisting on going to court despite her medical emergency. Thus, her deficiencies in respect to the filing of the Rule 26(b)(4) statement are in no way comparable to the repeated and intentional abuses found in *Bernstein*.[7]

■ Thus, in considering possibly comparable cases, we conclude that the Board's recommendation that Ms. Nwadike be sanctioned by informal admonition is appropriate. In reaching its decision, the Board considered the "seriousness of the misconduct and sanctions for comparable misconduct, prior discipline, prejudice to the client, violation of other disciplinary rules, whether the conduct involved dishonesty, the respondent's attitude, and circumstances in aggravation and/or miti-

---

7. Other cases imposing thirty-day suspensions usually involve more serious conduct or additional aggravating factors than what occurred in Ms. Nwadike's case. *See In re Boykins*, 748 A.2d 413, 413 n. 1, 414 (D.C.2000) (thirty-day suspension with probation where a relatively inexperienced attorney had violated Rules 1.1(a) (competence), 1.1(b) (skill and care), 1.3(a) (diligence and zeal), 1.3(c) (promptness), 1.5(b) (communication of fee), 1.7(b) (conflict of interest) and 8.4(d) (conduct interfering with the administration of justice)); *In re Lewis*, 689 A.2d 561, 562–566 (D.C.1997) (thirty-day suspension where respondent had intentionally abandoned his client in the midst of a federal criminal trial, violating Rules 1.1(b) (skill and care), 1.3(a) (diligence and zeal), 1.3(b)(1) (seeking the client's objectives), 1.6(a) (confidences of a client) and 8.4(d) (conflict interfering with the administration of justice), despite the fact that this was the respondent's first violation).

gation." These are all appropriate considerations, *see, e.g., Austin, supra,* 858 A.2d at 975, and the Board's analysis is based firmly on the record. Furthermore, to impose a more serious sanction would be inconsistent with cases involving comparable conduct. We therefore agree with the Board that an informal admonition is an appropriate sanction for Ms. Nwadike and reject Bar Counsel's request that we impose a thirty-day suspension. For the foregoing reasons, we hereby adopt the Board's recommendation and direct Bar Counsel to issue an informal admonition to the respondent.

*So Ordered.*