In re Theodore S. SILVA,
Jr., Respondent.

A Member of the Bar of the District of
Columbia Court of Appeals (Bar
Registration No. 412894).

Nos. 08–BG–82, 09–BG–1582.

District of Columbia Court of Appeals.

Argued Oct. 13, 2010.

Decided Sept. 1, 2011.

Theodore S. Silva, Jr., Pro Se.

Julia L. Porter, Senior Assistant Bar
Counsel, with whom Wallace E. Shipp, Jr.,
Bar Counsel, and Judith Hetherton, Senior

Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before GLICKMAN and FISHER, Associate Judges, and PRYOR, Senior Judge.

GLICKMAN, Associate Judge:

■ Having found that respondent Theodore S. Silva, Jr., committed serious transgressions of the Rules of Professional Conduct, including criminal acts and intentional dishonesty, the Board on Professional Responsibility recommends that we suspend him from practicing law for a period of three years and require him to demonstrate his fitness as a condition of reinstatement. The Board's report is appended to this opinion. Respondent and Bar Counsel take only limited exceptions to it. Neither party objects in any material respect to the Board's factual findings or its conclusion that respondent violated Disciplinary Rules 8.4(b) and 8.4(c), among others. Bar Counsel, though, disagrees with the recommended sanction and urges us to disbar respondent. However, in the interests of consistency and the deference we owe the Board, we opt to follow its recommendation. Respondent agrees that the sanction recommended by the Board is appropriate in his case; his only substantial question concerns the date when his period of suspension from the practice of law commenced. Per our normal practice,

we conclude that the effective date for reinstatement purposes is the date on which respondent fully complied with the notice and affidavit requirements of D.C. Bar Rule XI, § 14.[1]

## I.

As described more fully in the Board's report, respondent's primary misconduct occurred in connection with his representation of a client in a commercial real estate development project. Respondent was tasked with the preparation and negotiation of an easement agreement between his client and adjacent property owners. This agreement needed to be finalized, executed, and filed with the Recorder of Deeds before construction could proceed. Respondent neglected the assignment, but when his law partner and the client inquired about the agreement, respondent falsely told them it was completed. He then forged and falsely notarized the signatures of the other necessary parties to the easement agreement he had drafted, and presented that bogus document to his client and the client's trustee for their signatures. Thereafter, respondent falsely assured his client and his law partner that he had recorded the easement agreement.

Respondent believed he could replace the false agreement he had created with a genuine one signed by all necessary par-

---

1. In addition to the original matter that we discuss in this opinion, there is also before us a reciprocal discipline matter arising from a public reprimand issued by the Virginia State Bar Disciplinary Board to respondent in 2008. This reprimand arises from respondent's 2002 guilty plea in Virginia to possession of cocaine. The Board suggests that in lieu of reciprocal discipline, we direct Bar Counsel to publish notice of the Virginia disciplinary action on the D.C. Bar website. *See* D.C. Bar R. XI, § 11(c). However, we have declined to apply the amended provision of § 11(c) that the Board invokes here to a case, such as this one, that was pending when the amendment took effect. *See In re Fitzgerald,* 982 A.2d 743, 746 (D.C.2009). In the present circumstances, we agree with Bar Counsel that respondent's Virginia matter is one of the factors to be considered in determining an appropriate sanction for his misconduct and need not be handled separately. *Cf. In re Thompson,* 492 A.2d 866, 867 (D.C.1985) ("The appropriate question ... is simply this: If all of the matters were before the Board simultaneously, what would we recommend as the appropriate discipline?").

ties, without anyone being the wiser, but he never got around to doing so. Meanwhile, his client, relying on his false representations, proceeded with the closing on the property in December 2005 and entered into a construction contract. The client was obligated to give formal notice to the adjacent landowners of the commencement of construction. In January 2006, respondent prepared and sent that notice to his client, representing—falsely—that he had forwarded it to the neighboring owners as well.

Respondent's lies began to unravel when the client itself sent a copy of the notice to an attorney for one of the adjacent landowners. The attorney informed the client that the necessary easement agreement did not exist. Respondent initially told his client that the attorney was mistaken, but he soon admitted his misconduct. He attributed his errant behavior to his addiction to cocaine and other personal problems. Respondent's law firm incurred considerable expense to resolve the problem respondent had created and avoid material injury to the client. The firm terminated respondent and reported his misconduct to Bar Counsel.

The ensuing disciplinary proceedings are recounted in the Board's report, and we need not detail them here, except to note the following. In his dealings with Bar Counsel and the Hearing Committee, respondent acknowledged his wrongdoing but continued to ascribe it to his struggles with cocaine addiction and other problems. Respondent further represented that he had completed treatment and made progress in overcoming his addiction. As the

Board explains, much of what respondent said in this connection was false, including his statement under oath at the hearing that he had stopped using cocaine in May 2006.[2] The Board rejects respondent's effort to blame his misconduct on his cocaine addiction and other personal problems, and it views respondent's dishonesty and misrepresentations during the disciplinary proceedings as a significant aggravating factor in making its sanction recommendation.

## II.

In the words of the Board, which echo the findings of the Hearing Committee, "the record in this case demonstrates a pattern of deceit and intentional falsehood and misrepresentation that warrants a severe sanction."[3] In view of the aggravating factors present in this case, the Hearing Committee thought respondent should be disbarred, but the Board disagrees. Finding that comparable misconduct by other attorneys has resulted in discipline short of disbarment, it recommends a three-year suspension from the practice of law, coupled with a requirement that respondent demonstrate fitness as a condition of reinstatement. Bar Counsel would have us reject that recommendation and adopt that of the Hearing Committee instead.

We think a strong enough case for rejecting the Board's recommendation has not been made. A sanction recommendation from the Board "comes to us with a strong presumption in favor of its

---

2. To be fair, respondent corrected this misstatement when prodded by Bar Counsel, and he asserts that it was basically true and inaccurate only because he subsequently had a relapse several months later. Nonetheless, the Hearing Committee made a credibility determination that respondent initially lied.

3. Report and Recommendation of the Board on Professional Responsibility (hereinafter, "Board Report"), set forth in the appendix to this opinion, at 33–34.

imposition."[4] Our Rules provide that we shall adopt the Board's recommended disposition "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted."[5] This Rule

> endorses the Board's exercise of broad discretion in handing out discipline that is subject only to a general review for abuse in that discretion's exercise. The rule requires that we enforce a general sense of equality in the sanctions handed out, but it otherwise commands that we should respect the Board's sense of equity in these matters unless that exercise of judgment proves to be unreasonable.[6]

Thus, "[g]enerally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed."[7]

 Judged in accordance with these settled principles of deferential review, the Board's recommendation of a three-year suspension with a proof-of-fitness requirement is unimpeachable. That disposition is not inconsistent with the discipline we have ordered in comparable cases. We imposed three-year suspensions (with or without fitness), for example, in *In re Kline*[8] and *In re Slaughter*,[9] where the respondent attorneys' misconduct also involved dishonesty, forgery, other aggravating circumstances, and similar or identical Rule violations.[10] This is not a case, moreover, in which it can be said that the Board grossly underestimates the seriousness of the respondent's misconduct.[11] Perfect consistency is not achievable in this area; but as the Board states, the cases in which we have disbarred attorneys for dishonest conduct have been more egregious than this one, and typically have involved "prolonged misconduct involving dishonesty, misappropriation of client funds or actions that abused the attorney-

---

4. *In re Goffe*, 641 A.2d 458, 463 (D.C.1994) (citation omitted).

5. D.C. Bar R. XI, § 9(h)(1).

6. *Goffe*, 641 A.2d at 464 n. 7 (quoting *In re Haupt*, 422 A.2d 768, 771 (D.C.1980)).

7. *Id.* at 463–64.

8. 11 A.3d 261 (D.C.2011). The attorney's misconduct in *Kline* included, in addition to unauthorized use of client funds, "dishonesty and deceit toward both his client and an adversary to cover up the neglect of his client's case; the criminal act of forgery; the deliberate failure to communicate with his client about the status and direction of the case; and the deliberate frustration of the client's objective by settling the case, through a false agreement, without the client's permission." *Id.* at 265.

9. 929 A.2d 433 (D.C.2007). In *Slaughter*, the attorney misrepresented to his law firm that he had been hired by the State of Arkansas on a contingent basis to handle an environmental lawsuit. His dishonest scheme included falsifi-

cation and alteration of documents and forgery of an assistant attorney general's signature.

10. *See also In re Guberman*, 978 A.2d 200 (D.C.2009) (eighteen-month suspension for attorney who falsified documents and falsely represented to his law firm that he had filed an appeal); *In re Pennington*, 921 A.2d 135 (D.C.2007) (two-year suspension with fitness requirement for attorney who, *inter alia*, falsified a settlement of her clients' case in order to conceal from them the fact of its dismissal); *In re Steele*, 868 A.2d 146 (D.C.2005) (three-year suspension with fitness requirement for attorney who lied to clients and submitted a fabricated subpoena).

11. When this court disagrees with the Board as to the seriousness of the attorney's ethical violations, the Board's recommendation carries "less weight." *In re Kennedy*, 542 A.2d 1225, 1228 (D.C.1988). *See, e.g., Pennington*, 921 A.2d at 142 (rejecting recommendation of a thirty-day suspension where Board "seriously minimized" the misconduct in question).

client privilege." [12] Bar Counsel argues that respondent's false representations during the disciplinary process, including a false statement under oath at the hearing about his cocaine usage, weigh heavily in favor of disbarment. This is not a case, however, in which the attorney lied to cover up his misconduct,[13] and as the Board observes, false testimony "does not generally result in disbarment even when accompanied by dishonesty." [14] In sum, we cannot say that the Board's discretionary judgment as to the appropriate sanction is unreasonable, or that its recommendation falls outside "the wide range of acceptable outcomes." [15] Accordingly, we adopt it.[16]

## III.

■ After respondent formally raised a so-called *Kersey* mitigation defense by filing an Acknowledgment of Disabilities and Addiction,[17] the Board issued an order imposing certain conditions on his continued practice of law in the District of Columbia pending the outcome of the proceedings. The Board amended this order on December 10, 2007. Recognizing that respondent was working as a contract attorney, the amended order required him to provide thirty days' notice to the Board and Bar Counsel if he intended to begin representing clients, so that the Board could consider appointing a monitor to supervise his practice at that time. So far as appears, respondent never provided such notice and continued for some time to work solely as a contract attorney without clients of his own. Subsequently, on May 21, 2010, after receiving the Board's report and recommendation, this court entered an interim order suspending respondent pending final action.[18] Several months later, on December 17, 2010, respondent submitted an affidavit pursuant to Rule XI, § 14, averring, *inter alia*, that he had no clients to whom notice of the suspension was due.[19]

12. Board Report at 36. *See In re Pelkey*, 962 A.2d 268, 281 (D.C.2008); *Pennington*, 921 A.2d at 141; *In re Goffe*, 641 A.2d 458, 464–68 (D.C.1994); *see also In re Cleaver–Bascombe*, 986 A.2d 1191, 1199 (D.C.2010) (finding "flagrant" dishonesty meriting disbarment where attorney "submitted a 'patently fraudulent' voucher seeking compensation from public funds for work she had not performed"); *In re Corizzi*, 803 A.2d 438, 443 (D.C.2002) (disbarring attorney for subornation of perjury and other misconduct "reflect[ing] a continuing and pervasive indifference to the obligations of honesty in the judicial system and to the duty of loyalty to the interests of his clients").

13. *Cf. Cleaver–Bascombe*, 986 A.2d at 1200 ("[L]ying under oath on the part of an attorney for the purpose of attempting to cover-up previous misconduct is absolutely intolerable.") (quoting *In re Cleaver–Bascombe*, 892 A.2d 396, 412 (D.C.2006); internal quotation marks, ellipses, and brackets omitted).

14. Board Report at 35. *See, e.g., In re Daniel*, 11 A.3d 291, 301 (D.C.2011).

15. In point of fact, the difference between disbarment and a three-year suspension is not so great, for even a disbarred attorney may seek readmission to the Bar after five years.

16. The fitness requirement, which respondent does not oppose, is amply justified in the Board's report. *See In re Cater*, 887 A.2d 1, 24–26 (D.C.2005).

17. *See generally In re Kersey*, 520 A.2d 321 (D.C.1987); *see also In re Marshall*, 762 A.2d 530 (D.C.2000) (holding that a mitigation defense cannot be based on the attorney's addiction to illegal drugs).

18. *See* D.C. Bar R. XI, § 9(g).

19. The affidavit should have been filed within ten days of the suspension order. (Bar Counsel informed respondent of his responsibilities under Rule XI, § 14, at that time.) That aside, to our knowledge Bar Counsel has not questioned the affidavit's adequacy.

Respondent argues that his license to practice law was suspended, as a practical matter, when the Board issued its December 10, 2007, order, and that his three-year suspension therefore should run from that date (in which case he would be entitled by now to apply for reinstatement). We disagree. The December 2007 order did not suspend respondent, and he continued to practice law in the District of Columbia, albeit as a contract attorney. But even if respondent had been suspended and had stopped practicing law in December 2007, he still would be ineligible for the *nunc pro tunc* treatment he requests because he did not comply with the notice and affidavit requirements of Rule XI, § 14 until much later (i.e., December 2010).[20]

## IV.

Respondent is hereby suspended from the practice of law in the District of Columbia for three years, effective from the date on which he filed (or, if necessary, hereafter files) the affidavit required by D.C. Bar Rule XI, § 14(g), and subject to the requirement that he demonstrate his fitness to resume the practice of law as a condition of his reinstatement.

*So ordered.*

## APPENDIX

### DISTRICT OF COLUMBIA COURT OF APPEALS

### BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of: THEODORE S. SILVA, JR., Respondent.

A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 412894)

Bar Docket Nos. 077–06 and 062–08

### REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

Respondent is before the Board on Professional Responsibility ("Board") on consolidated original and reciprocal disciplinary matters. The original matter relates to Respondent's admitted failure to complete work for a client, his subsequent falsification of the signatures of others, including falsely notarizing documents, and falsely advising his client and supervising partner that work had been completed. The Hearing Committee found violations of eight disciplinary rules and recommended that Respondent be disbarred. *In re Silva*, Bar Docket Nos. 077–06 and 062–08 at 54 (Hr'g Comm. Rpt. Jan. 26, 2009) ("H.C.Rep."). In reaching that recommendation, the Hearing Committee rejected Respondent's claim of mitigation under *In re Kersey*, 520 A.2d 321 (D.C.1987) (en banc).

The reciprocal discipline matter arises out of Respondent's felony conviction in late 2002 in Arlington, Virginia, for possession of cocaine.[1] Respondent never reported that conviction to the Virginia State Bar Disciplinary Board (the "Virginia Board") or to Bar Counsel. After the Virginia Board learned of the conviction in 2007, it directed Respondent to show cause and noticed a hearing relating to the conviction. On January 22, 2008, Respondent entered into an Agreed Disposition with the Virginia Board pursuant to which the

---

**20.** *See In re Soininen*, 853 A.2d 712, 726–28 (D.C.2004).

**1.** Respondent's conviction was vacated upon his completion of the conditions of his sen-

tence and probation. *See* Order, *Virginia v. Silva*, CR02–2286, General District Court for Arlington County, Virginia (Mar. 15, 2005).

Virginia Board issued a Public Reprimand With Terms.[2] Bar Counsel advised the Court of the Virginia disciplinary action in February 2008, and on March 4, 2008, the Court referred the matter to the Board. Order, *In re Silva,* No. 08–BG–82 (D.C. Mar. 4, 2008). The two matters were consolidated pursuant to Bar Counsel's Unopposed Motion to Consolidate, which was granted by the Board on April 6, 2009.[3] Oral argument was held before the Board on April 9, 2009.

We recommend that Respondent be suspended for three years with a fitness requirement in connection with the original matter. With respect to the reciprocal disciplinary matter, we recommend that, in light of the Court's decisions in *In re Filomeno,* No. 07–BG–863 (D.C. Aug. 18, 2008) (per curiam), and *In re Portner,* No. 08–BG–28 (D.C. Feb. 4, 2009) (per curiam), the Court require Bar Counsel to publish the reprimand by the Virginia Board on the D.C. Bar Website in accordance with D.C. Bar R. XI, § 11(c).

## I. THE ORIGINAL MATTER

### (Bar Docket No. 077–06)

#### *Background*

On June 29, 2007, Bar Counsel filed a Specification of Charges alleging that Respondent had violated Rules 1.3(a), (b) & (c), Rules 1.4(a) & (b), and Rules 8.4(b) & (c) in connection with his handling of a real estate transaction while he was a partner at the law firm of Holland & Knight. After obtaining several extensions of time, Respondent on November 6, 2007, filed his

Answer and an Acknowledgement of Disability (or Addiction) ("Acknowledgement") in which he raised a *Kersey* defense in mitigation pursuant to Board Rule 7.6(a). In that Acknowledgement, he claimed that any misconduct was the result of his alcohol and cocaine addiction and his attention deficit disorder ("ADD") and depression. On December 4, 2007, the Board, acting pursuant to Board Rule 7.6(c), issued an Order, amended by an Order issued on December 10, 2007, conditioning Respondent's continued practice of law on his (i) abstaining from the use of alcohol and the recreational use of any drugs during the pendency of this proceeding, (ii) filing quarterly reports with the Board, with a copy to Bar Counsel, of the results of his random drug testing, and (iii) providing 30 days' notice to the Board and Bar Counsel of his intent to represent clients so that the Board can consider the appointment of a monitor to supervise his practice at that time. Order, *In re Silva,* Bar Docket No. 077–06 (BPR Dec. 4, 2007); Amended Order, *In re Silva,* Bar Docket No. 077–06 (BPR Dec. 10, 2007). Respondent is currently practicing as a contract attorney reviewing documents, Tr. 161,[4] and has not sought approval to represent clients.

The matter was assigned to Hearing Committee Number Seven which held prehearing conferences on October 1st and November 2, 2007, and a hearing on December 10, 2007. Respondent was represented by counsel. Prior to the hearing, the parties entered into a detailed stipulation in which Respondent admitted to the facts concerning his misconduct and admitted that his conduct violated Rule 1.3(a),

---

**2.** *In re Theodore Scott Silva, Jr.,* Order of Public Reprimand, with Terms, VSB Dkt. No. 08–000–073253 (Jan. 31, 2008).

**3.** Order, *In re Silva,* Bar Docket Nos. 077–06 & 062–08 (BPR Apr. 6, 2009).

**4.** The transcript of the December 10, 2007, hearing will be cited as "Tr. _____".

Rules 1.4(a) & (b), and Rule 8.4(c). Joint Stipulations, filed Nov. 20, 2007 ("Joint Stipulations"). At the hearing, Bar Counsel called two witnesses, Mr. David Kahn, the partner at Holland & Knight with whom Respondent worked extensively, Tr. 25–30, 90, and Dr. Neil Blumberg, a forensic psychiatrist who testified as an expert witness. Bar Counsel offered 28 exhibits into evidence, BX A–D & BX 1–24,[5] which were admitted without objection. Tr. 22, 228, 241. Respondent testified on his own behalf and offered two exhibits into evidence, RX 1–2, which were also admitted without objection. Tr. 164, 170.

The Hearing Committee prepared a detailed and comprehensive report in which it held that Respondent had violated Rule 1.3(a) (duty to provide zealous and diligent representation within the bounds of the law), Rule 1.3(b)(1) (intentional failure to seek client's lawful objectives), Rule 1.3(b)(2) (intentional prejudice or damage to a client), Rule 1.3(c) (failure to act with reasonable promptness), Rule 1.4(a) (duty to keep a client reasonably informed as to the status of a matter and promptly comply with reasonable requests for information), Rule 1.4(b) (duty to explain a matter to a client so that the client may make informed decisions about the representation), Rule 8.4(b) (criminal conduct reflecting adversely on the lawyer's honesty, trustworthiness or fitness), and Rule 8.4(c) (dishonesty and misrepresentation). As noted, the Hearing Committee recommended that Respondent be disbarred.

*Findings of Fact*

The essential facts concerning Respondent's conduct are admitted in the Joint Stipulations and set forth in detail in the Hearing Committee's Findings of Fact.

Those findings are supported by clear and convincing evidence and, except to the extent that they are clarified or modified by the findings below, we adopt them.[6]

1. Respondent's Misconduct

Respondent was a real estate lawyer with the firm of Holland & Knight. He joined the firm in 1994 and was made a partner in 1995. FF 2, H.C. Rep. at 3. No later than 2003, Mr. Kahn asked Respondent to negotiate and prepare an Easement Relocation Agreement ("ERA") between their client, 15th & L Street Development, LLC (the "Client"), adjacent land owners and others to close an alley in connection with the redevelopment of certain property the Client had acquired on 15th and L Streets in Washington, D.C. FF 3–5, H.C. Rep. at 3–4. While Respondent started work on the ERA in a timely manner, meeting with counsel for the other parties, he never completed the ERA. Rather, he provided the Client with an ERA on which he signed the names of representatives of the adjacent landowners and other parties and signed the notarizations of those signatures using names of fictitious D.C. notaries. FF 7–13, H.C. Rep. at 5–8. Respondent also falsely assured Mr. Kahn and the Client that the ERA had been recorded in the land records of the District of Columbia. FF 16, H.C. Rep. at 8–9.

In reliance on Respondent's representations that the ERA was completed, the Client proceeded with closing and entered into a construction contract for the project. FF 17–18, H.C. Rep. at 9. In January 2006, Respondent provided the Client with a Construction Commencement Notice, as required by the ERA, purporting to give

---

**5.** Bar Counsel's and Respondent's exhibits will be cited as "BX ____", and "RX ____", respectively.

**6.** The Hearing Committee's Findings will be cited as "FF ____".

the other parties notice of the Client's intent to commence construction in 45 days. While he advised the Client that he had sent the notice to the other parties, he did not. FF 19–20, H.C. Rep. at 9–11. On January 27, 2006, an assistant to the Client's representative sent a copy of a revised Construction Commencement Notice to William Carmody, Esq., counsel for one of the adjacent land owners. FF 22, H.C. Rep. at 11.

On January 30, 2006, Mr. Carmody sent a letter by fax to Respondent, the Client and others involved in the transaction advising them that the ERA referenced in the Construction Commencement Notice did not exist. Mr. Carmody stated that his client had never agreed to the terms of an ERA, and that, until there was a valid agreement among the parties, the "rights and obligations of our respective clients continued to be governed by the existing easement agreements....". BX 15; FF 23, H.C. Rep. at 11–12. Respondent sent an e-mail to the Client on the following morning assuring it that Carmody's fax was a misunderstanding and that he would straighten it out in the morning. FF 24, H.C. Rep. at 12. When the Client could not reach Respondent that day, it notified Mr. Kahn, who then confronted Respondent. Joint Stipulations, ¶ 19; FF 27, H.C. Rep. at 13.

Respondent admitted his actions and attributed them to stress, his use of cocaine and drinking. FF 24–27, H.C. Rep. at 12–13. Mr. Kahn notified the Client, undertook to cure the problems caused by Respondent's misconduct, and did so at a substantial cost to the law firm. Mr. Kahn did not bill the Client for the time required to cure the problems, the law firm agreed to reimburse the other parties for their costs in dealing with the situation and the firm agreed to pay the Client for its out-of-pocket damages due to Respondent's misconduct.[7] In total, Holland & Knight incurred approximately $150,000 in out-of-pocket expenses plus the value of the 50 hours Mr. Kahn devoted to curing the problems caused by Respondent's misconduct. FF 28–31, H.C. Rep. at 13–14. As a result of Mr. Kahn's efforts and delays in getting the Client's permits, the Client did not suffer any material injury as a result of Respondent's misconduct. FF 31, H.C. Rep. at 14.

### 2. Dealings With Bar Counsel

Holland & Knight suspended Respondent immediately after it learned of his actions and subsequently terminated him. FF 32, H.C. Rep. at 14–15. It also advised Respondent that his misconduct would have to be reported to Bar Counsel and suggested that he might wish to self-report. It delayed the filing of a complaint to allow Respondent to report first. FF 35, H.C. Rep. at 15. When Respondent had not reported the matter to Bar Counsel by March 10, 2006, over a month after his misconduct came to light, the firm reported Respondent to Bar Counsel. Respondent self-reported on March 15, 2006, FF 36–37, H.C. Rep. at 16, a month and a half after his misconduct was uncovered. In his letter to Bar Counsel, Respondent admitted that he had been a "regular cocaine user" for approximately ten years. He alleged that he had entered into a treatment program in 2003, which he "successfully completed," and that he began using cocaine again in 2005 but had not used cocaine since January 31, 2006. He

---

7. The Client had agreed to cover some of the costs of the other parties in connection with the ERA, and while not explicit in the Hearing Committee's findings, it appears that Holland & Knight picked up the added costs as well as some of the costs the Client would have incurred without Respondent's misconduct. Tr. 64–65.

also advised Bar Counsel that he had enrolled in an out-patient treatment program at Kolmac Clinic in 2006 that required him to submit to random drug tests. FF 38, H.C. Rep. at 16–17.

Most of what he told Bar Counsel was false.[8] He had not stopped using cocaine but continued to use it through May 2006, when he apparently ran out of money, after spending $20,000 to $30,000 of his 2005 bonus and his severance pay on cocaine.[9] He did not enroll in a treatment program in 2006, and he did not submit to random drug testing. FF 39, H.C. Rep. at 17. Further, while he had entered a treatment program in 2004 as part of his plea agreement with Virginia for possession of cocaine, he did not "successfully complete" the program. Rather, he dropped out of the after-care program, falsely representing to the clinic that his father had died. FF 40, H.C. Rep. at 17–18.[10]

### 3. *Actions Before the Hearing Committee*

On the day the hearing in this disciplinary proceeding was originally scheduled to commence, Respondent filed his Answer and an Acknowledgement in which he claimed that his misconduct would not have occurred but for his disabilities. FF 41, H.C. Rep. at 18.[11] When he filed the Acknowledgement, he had not sought any medical or psychological treatment for his disabilities, other than the treatment as a result of his plea agreement. And, while he stated in the Acknowledgement that he had been attending Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings since January 2006, he did not begin attending those meetings until November 2006, about the time he filed his Acknowledgement. FF 42, H.C. Rep. at 19–20. He also admitted to Dr. Blumberg and at the hearing that he used cocaine on three occasions over a period of days in November 2006. Tr. 220–21; BX 22 at 4; FF 42, 54, H.C. Rep. at 19–20, 23.[12] He continued to consume alcohol. FF 42, H.C. Rep. at 19–20. At the hearing, he testified that he ceased using alcohol after receiving the Board's December 4, 2007 Order directing him to abstain from the use of alcohol or any recreational drug. FF 55, H.C. Rep. at 23–24.[13]

---

8. In addition to these lies, Respondent also lied when he postponed a meeting he scheduled with Bar Counsel on the grounds that his nephew had been killed in an automobile accident. He had no nephew. FF 40, H.C. Rep. at 17–18 n. 6.

9. Respondent left the Washington area for Cape Cod in May 2006 to work with his brother, a lobster fisherman. FF 53, H.C. Rep. at 23. He returned to the Washington area in the fall of 2006. FF 54, H.C. Rep. at 23.

10. While he did not "successfully complete" the program, Respondent satisfied the terms of his probation. *See* Order, *Virginia v. Silva*, CR02–2286 (Mar. 15, 2005).

11. Respondent never submitted a Rule 11.12 motion or otherwise complied with Rule 11.12. H.C. Rep. at 43.

12. Respondent initially testified that he ceased using cocaine in May 2006, Tr. 160–61, 168, 217, but subsequently corrected his statement in response to Bar Counsel's questioning. Tr. 220–21, 254–55.

13. Respondent's compliance with these conditions has been spotty, at best. Bar Counsel reports that he has only filed three quarterly reports with either the Board or Bar Counsel from December 2007, when the Order was issued, until March 2009. Bar Counsel's Brief in Opposition to Respondent's Exceptions to the Hearing Committee's Findings and Recommendation at 5 n. 2 (filed Mar. 25, 2009) ("B.C.Brief"). He has since filed a report in June and September, 2009. *See* Facsimiles dated June 18 and Sept. 22, 2009 from Timothy J. Battle, Esq. to Julia Porter, Esq. *et al.*, transmitting May 26 and Sept. 14, 2009 lab reports on Respondent from Virginia Hospital Center—Arlington.

#### 4. *Kersey Claims in Mitigation*

In order to raise a *Kersey* defense in mitigation, a respondent must demonstrate (a) by clear and convincing evidence that he suffers from the disability or addiction, (b) by a preponderance of the evidence that the misconduct would not have occurred but for the disability or addiction, and (c) that there is significant evidence of rehabilitation. *See In re Stanback*, 681 A.2d 1109, 1114–15 (D.C.1996); *Kersey*, 520 A.2d at 327. Respondent asserts that he was addicted to cocaine and alcohol and suffered from ADD and depression.

#### a. *Respondent's Claims of ADD and Depression*

The Hearing Committee found that Respondent did not meet his burden of proof that he suffered from ADD or depression. FF 62–65, H.C. Rep. at 27–28. Aside from Respondent's statements concerning these afflictions, Respondent never introduced any additional evidence. On the other hand, Dr. Blumberg testified and stated in his report that Respondent's depression was situational and was not related to his misconduct. FF 63, H.C. Rep. at 27. Dr. Blumberg also testified that, based on Respondent's history and ability to handle complex legal matters, Respondent did not suffer from ADD or attention deficit hyperactivity disorder ("ADHD"). FF 65, H.C. Rep. at 28. Based on the record, we agree with the Hearing Committee that Respondent did not show by clear and convincing evidence that he suffered either from depression, ADD or ADHD.[14]

#### b. *Respondent's Alcohol Addiction*

The Hearing Committee did not specifically address whether Respondent was addicted to alcohol. His testimony concerning his use of alcohol was inconsistent. He stated that he started drinking alcohol as a teenager and continued to drink until early December 2007. FF 55, H.C. Rep. at 23–24. He also testified that he used alcohol "every day or other day or so, although not to excess" and that "if I got buzzed once a month that would be about probably accurate, and drunk once a year. I never really drank much alcohol anyways [sic]." Tr. 167–68. Mr. Kahn tended to support the latter statement as he testified that he had never seen Respondent inebriated at work.

Based on the record and the Hearing Committee's findings concerning his use of alcohol, we conclude that Respondent did not bear his burden of demonstrating by clear and convincing evidence that he was addicted to alcohol. While Bar Counsel introduced evidence that he had been arrested for drunk and disorderly conduct in the late 1970s and early 1980s, BX 22 at 5, there is scant evidence that Respondent could not control his use of alcohol or that alcohol addiction was the cause of his misconduct. FF 56, H.C. Rep. at 24. What evidence there is concerning his use of alcohol is to the contrary. Further, even if Respondent had demonstrated that he was addicted to alcohol, he failed to satisfy the third element of *Kersey* since, except for an occasional AA meeting, he had never participated in any program for alcohol abuse until after the hearing, when, in December 2007, he entered a resident program at Second Genesis. FF 58, H.C. Rep. at 24–25.[15]

---

**14.** It is not clear whether Respondent continues to advance these claims as they are not discussed in his brief.

**15.** Respondent asserts in his brief before the Board that he spent 68 days at Second Gene-

sis and resided at a transition house for 90 days thereafter. During that period he attended AA and NA meetings every day and is currently involved in a monitoring program administered by the D.C. Bar Lawyer Counseling Program. He also states that he at-

### c. Respondent's Cocaine Addiction

In his interview with Dr. Blumberg, Respondent admitted that he had been using cocaine since college and that he was using cocaine daily when he became a partner at Holland & Knight in 1995. FF 43, H.C. Rep. at 20; BX 22 at 4. In July 2002, he pled guilty to felony possession of cocaine and was sentenced to two years probation.[16] Respondent continued to use cocaine during the first year of his probation, and entered treatment only when his probation officer threatened to report him. Tr. 184, 336–37; BX 22 at 4. Respondent participated in a two month out-patient program at Kolmac Clinic, but did not carry through with his scheduled aftercare. FF 44–46, H.C. Rep. at 20–21. In May 2005, after his probation had been completed, the court in Virginia dismissed the criminal matter.[17]

Respondent resumed using cocaine on a daily basis within a month and a half. FF 48, H.C. Rep. at 22. While using cocaine during this period, Respondent was in arrears on his child support payments.[18] At the time of the hearing, he was subject to a garnishment order because of his failure to pay child support. FF 50, H.C. Rep. at 22. Respondent admitted that he had switched temporary employment agencies to avoid having his income garnished. He also admitted that he had not filed income tax returns, or extension requests, for three years. *Id.*

Respondent testified that cocaine helped him concentrate and, while it took him longer to complete his work, the work was "perfect." FF 51, H.C. Rep. at 22–23. These claims as to the substantive quality of his work were generally supported by Mr. Kahn, who was aware of his cocaine conviction but not his continued use. Tr. 74–77; FF 47, H.C. Rep. at 21. Mr. Kahn testified that the work was "the best" and "excellent." FF 52, H.C. Rep. at 23. Mr. Kahn also stated that there had never been a comparable event in the many years he had worked with Respondent. He testified that he would work with Respondent again and had tried to get the firm to allow him to use Respondent because of the quality of his work. Mr. Kahn stated that he "had never seen him do anything that was remotely like this"—referring to the misconduct involved here. *See, e.g.,* Tr. 88–89, 98–104.

Although the Hearing Committee did not make any express findings, the record is clear that Respondent was addicted to cocaine. However, the Court has made it clear that *Kersey* is inapplicable where the

---

tends a minimum of 3 AA or NA meetings a week, has a sponsor and does service work for Second Genesis. Brief of Theodore S. Silva to the Board of [sic] Professional Responsibility, Bar Docket No. 077–06, at 20 (filed Mar. 10, 2009) ("Resp.Brief"). That self-serving statement is not entitled to substantial weight as it has not been tested by cross-examination. *See, e.g., In re Cater,* 887 A.2d 1, 6 (D.C.2005).

**16.** *See* Order, *Virginia v. Silva,* CR02–2286 (Apr. 15, 2003).

**17.** *See* Order, *Virginia v. Silva,* CR02–2286 (Mar. 15, 2005).

**18.** The Hearing Committee found that he was in arrears in paying alimony. Respondent denies that he was required to pay alimony; he asserts he was only required to pay child support. Resp. Brief at 5. The only support for the statement that he was in arrears in his alimony was made by Mr. Kahn, and the statement was part of a response to a question concerning Respondent's financial situation. Tr. 106. Further, Bar Counsel did not explore any deficiency in Respondent's alimony payments but addressed only his failure to make child support payments. *Id.* at 244–46. In light of these facts, we conclude that the finding concerning his failure to pay alimony is not supported by clear and convincing evidence.

respondent relies on addiction to cocaine. *In re Marshall,* 762 A.2d 530 (D.C.2000); *In re Soininen,* 783 A.2d 619 (D.C.2001). Even assuming *arguendo* that Respondent could invoke a *Kersey* mitigation claim, he did not establish the second or third element of the *Kersey* burden with respect to his cocaine addiction. Based essentially on Dr. Blumberg's testimony, the Hearing Committee held that Respondent's substance abuse did not cause him to engage in the misconduct. FF 59–60, H.C. Rep. at 25–26. Dr. Blumberg noted that Respondent was able to do the work and that his product was excellent. If there was an impairment due to substance abuse, Dr. Blumberg testified it would have been more widespread. He also testified that Respondent knew that lying to his client was wrong, and that Respondent thought he could correct the matter without being caught. Respondent had explained to Dr. Blumberg that:

> I will let things go, push things off, procrastinate and then I lie. I put off the easement agreement. There was no rush. There was no urgency until the end. I lied to my boss ... I would always get things done. In the past, if I lied, I would do the project within twenty-four hours. I might be late, but I always got things done.

FF 14, H.C. Rep. at 8, citing BX 22 at 8. Dr. Blumberg also testified that Respondent had told him that he believed he could "bail himself out" of the situation here because "he always did at the eleventh hour in other matters." FF 60, H.C. Rep. at 25–26.

Respondent himself testified that he had trouble telling the truth and that he was "an addict of privilege, ... not of money but of something that allows me to get out of trouble...." FF 59–61, H.C. Rep. at 25–26. He admitted that he needed "help, not just with cocaine addiction, but ...

with my veracity, with my narcissisms.... I think that I can ... manipulate people ... and that is what led me to this, ... that I can pull this out of the hat,.... I did it a thousand times." Tr. 256–57.

### Analysis

#### A. Stipulated Rule Violations

Respondent admitted in the Joint Stipulations that he violated Rules 1.3(a), the duty to provide zealous and diligent representation within the bounds of law, Rule 1.4(a), the duty to keep a client reasonably informed as to the status of a matter and promptly comply with reasonable requests for information, Rule 1.4(b), the duty to explain a matter to a client so that the client may make informed decisions about the representation, and Rule 8.4(c), dishonesty and misrepresentation. Joint Stipulations at 6. The Hearing Committee concluded that Respondent had also violated Rules 1.3(b)(1) & (2), 1.3(c) and 8.4(b). Rules 1.3(b)(1) & (2) provide that it is misconduct for an attorney to intentionally to fail to seek a client's lawful objectives and intentionally prejudice or damage a client. Rule 1.3(c) makes it misconduct for an attorney to not act with reasonable promptness, and Rule 8.4(b) makes it a violation of the Rules for an attorney to engage in criminal conduct reflecting adversely on the lawyer's honesty, trustworthiness or fitness.

In his brief, Respondent did not directly challenge the Hearing Committee's findings concerning Rules 1.3(b) and 1.3(c), although he maintains, as he did at the hearing, that his conduct was the result of his cocaine addiction. Resp. Brief at 15, 19. That claim is foreclosed by the decision in *Marshall, supra.* Further, the evidence clearly supports the Hearing Committee's findings with respect to the violations of Rules 1.3(a), 1.3(b)(1), 1.3(c) and Rules 1.4(a) and 1.4(b). It is undeni-

able that Respondent failed to complete the ERA, to keep the Client informed as to the status of the ERA, to keep the Client abreast of developments so that the Client may make an informed decision about the representation, and to seek the Client's lawful objectives.

Similarly, the violation of Rule 8.4(c) is clear. That rule prohibits a lawyer from "engaging in conduct involving dishonesty, fraud, deceit or misrepresentation." Respondent's falsifying the signatures of the other parties to the transaction, representing that those documents were notarized when they had not been, and advising his client and his partner that the ERA was completed and filed in the land records of the District of Columbia constitute the very type of conduct proscribed by that rule.

### B. *Rule 1.3(b)(2)-Intentionally Prejudicing or Damaging a Client*

The evidence in support of the Hearing Committee's findings with respect to the violation of Rule 1.3(b)(2), is somewhat more tenuous. That rule provides that "a lawyer shall not intentionally ... prejudice or damage a client during the course of the professional relationship." While intent can be inferred from the surrounding facts, *see, e.g., In re Godette,* 919 A.2d 1157, 1165–66 (D.C.2007), there is scant evidence that Respondent intentionally sought to prejudice or damage the Client. He testified that he always sought to advance the Client's interest and there was no evidence to the contrary. However, the Court has held that "[n]eglect ripens into an intentional violation when the lawyer is aware of his neglect of the client matter, or the neglect is so pervasive that the lawyer must be aware of it." *In re Lewis,* 689 A.2d 561, 564 (D.C.1997). As the Hearing Committee concluded:

Respondent knew that he had neglected to finalize the ERA when he lied to his Client and Mr. Kahn that the ERA had been completed, and, when he later forged the other parties' signatures thereto. Thereafter, Respondent was reminded on a number of occasions that he had failed to pursue the Client's objectives with respect to the ERA, including in the latter part of 2005, when the Client and Mr. Kahn sought assurances from Respondent that the ERA had been filed with the D.C. Recorder of Deeds, and in January 2006, when the Client requested Respondent to prepare and circulate the 45–day Construction Commencement Notice required under the ERA. Notwithstanding these periodic reminders that he had neglected to complete or finalize the ERA, Respondent took no steps to do so....

H.C. Rep. at 36. That conclusion is well supported in the record and we agree with the Hearing Committee that Bar Counsel established a violation of Rule 1.3(b)(2) by clear and convincing evidence.

### C. *Violation of Rule 8.4(b)*

Although Respondent states in his brief that he does not challenge any specific finding of the Hearing Committee, Resp. Brief at 2, he does contend that he did not engage in any criminal activity. *Id.* at 15; Tr. 259–62. Since criminal conduct is an essential element of a Rule 8.4(b) violation, we interpret that assertion as an objection to the Hearing Committee's conclusion that he violated Rule 8.4(b).

Rule 8.4(b) provides that it "is professional misconduct for a lawyer to ... (b) commit a criminal act that reflects adversely on a lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects...."[19] As the Hearing Committee recognized, a respondent does not have to

---

**19.** Bar Counsel contends that, notwithstand- ing Respondent's position that he did not en-

be charged criminally or convicted to violate the rule. H.C. Rep. at 29. It is sufficient if his conduct violated a criminal statute and the crime reflects adversely on his honesty, trustworthiness, or fitness. *In re Slattery*, 767 A.2d 203, 207 (D.C. 2001); *see In re Pierson*, 690 A.2d 941 (D.C.1997); *In re Gil*, 656 A.2d 303 (D.C. 1995). The Hearing Committee held that Respondent committed forgery by falsely signing the names of the other parties to the ERA, signing the names of fictitious notaries, and presenting it to his Client and others as complete and executed by the other parties. H.C. Rep. at 30. It also found that he falsely impersonated a public officer in violation of D.C.Code § 22–1404 when he signed the names of the fictitious notaries on the ERA. H.C. Rep. at 32. We agree with the Hearing Committee, although for somewhat different reasons, that Bar Counsel established that Respondent violated Rule 8.4(b) in signing the names of the other parties and purporting to have the documents notarized by signing the names of fictitious notaries. However, we conclude that Bar Counsel did not establish that Respondent violated D.C.Code § 22–1404.

### i. *Forgery*

The District of Columbia Code defines forgery as the "mak[ing], draw[ing], or utter[ing] a forged written instrument with intent to defraud or injure another." D.C.Code § 22–3241(b) (2009 ed.). A forged written instrument is defined as "any written instrument that purports to be genuine but which is not because it: (A) has been falsely made, altered, signed, or endorsed ..." *Id.* at § 3241(a)(1). "Utter" means to issue, authenticate, transfer, publish, sell, deliver, transmit, present, display, use, or certify. *Id.* at § 3241(a)(2).[20] There is no question but that Respondent forged an instrument and caused it to be uttered when he presented the ERA to his client. H.C. Rep. at 30. However, to establish that Respondent committed forgery or uttering, Bar Counsel was required also to show that he did so with fraudulent intent. *In re Slaughter*, 929 A.2d 433, 444 (D.C.2007); *In re Reback*, 487 A.2d 235, 242 (D.C.1985).

The Court has stated that:

"fraud" is a "generic term which embraces all the multifarious means ... resorted to by one individual to gain advantage over another by false suggestions or by suppression of the truth." Thus, to prove the defendant's fraudulent design, there must be evidence that the defendant [acted] ... to deceive another in order to gain some advantage thereby. But the advantage need not be monetary or even material in nature.[21]

---

gage in criminal activity, his admission that he forged the signatures of the adjacent landowners and purported to have the signatures notarized by signing the names of fictitious notaries is sufficient to sustain the finding that he violated Rule 8.4(b). B.C. Brief at 4. That position fails to take into account that proof of a violation of the forgery statute, D.C.Code § 22–3241, requires establishing that the forgery was undertaken with fraudulent intent. *See White v. United States*, 582 A.2d 774, 779 (D.C.1990) (per curiam); *Martin v. United States*, 435 A.2d 395, 398 (D.C. 1981) (per curiam).

**20.** Forgery and uttering are separate offenses, although included in a single statutory provision. *Driver v. United States*, 521 A.2d 254, 258 n. 5 (D.C.1987).

**21.** The D.C. Criminal Jury instructions are similar. They provide that "[t]he elements of the offense of forgery ... are that ... [the defendant] falsely made, altered, signed or endorsed a written instrument ... [and] intended to deceive or cheat someone for the purpose of either causing some financial loss to another or bring about some financial gain to himself...." Those instructions similarly

*Gary v. United States,* 955 A.2d 152, 155 (D.C.2008) (citing *In re Austin,* 858 A.2d 969, 976 (D.C.2004) (quoting *In re Shorter,* 570 A.2d 760, 767 n. 12 (D.C.1990) (per curiam) (citation omitted))). Bar Counsel argues that Respondent's fraudulent intent was established when he made "it appear that the other parties to the ERA had agreed to its terms ..." and because the forged "ERA was capable of prejudicing or harming the client." B.C. Brief at 27–28. However, that the document was *capable* of prejudicing or harming the Client does not establish that Respondent intended to harm the Client. And, as noted, he has claimed throughout this proceeding that he never intended to harm the Client; rather he wanted to advance the Client's interests and would clean up the matter later. *See, e.g.,* Tr. 148–49, 255–56; Resp. Brief at 9–10. Thus, the fact that Respondent intended to deceive the Client does not appear to be sufficient, standing alone, to support a finding that he violated D.C.Code § 22–3241(b).

The Hearing Committee held that Respondent acted with fraudulent intent because he forged the signatures of the other parties and the purported notaries in order to retain his employment by Holland & Knight. H.C. Rep. at 31–32. Respondent disputes that conclusion, arguing that the firm continued to employ him because he was providing valuable legal services to its clients and that, in fact, Mr. Kahn's testimony demonstrates that the firm would have continued to employ him had he admitted the forgeries. Resp. Brief at 15–16. Respondent's claim strains Mr. Kahn's testimony. Indeed, it is clear that Holland & Knight would have discharged him had he admitted the forgeries: it did so when it learned of the forgeries. On the other hand, there is no evidence to support the Hearing Committee's conclusion that he forged the signatures in order to keep his job. Based on the record, we do not know what the firm would have done had Respondent admitted that he had not completed the ERA and that he needed more time to finalize the document. And, given Mr. Kahn's defense of Respondent even after Respondent admitted the forgeries,[22] Respondent's tenure with the firm and the apparent quality of his work, there is a substantial question whether they would have discharged him under those circumstances.

Nonetheless, intent may be inferred from the facts surrounding Respondent's conduct and the Court has made it clear that we are not to ignore our common sense in evaluating the facts of a case. *See, e.g., Godette, supra.* Respondent forged the signatures of the other parties to the ERA and falsely purported to have had those signatures notarized for the purpose of deceiving his Client. The forged document deceived the Client, as it went forward with the transaction based on it, and the Client would have been harmed by Respondent's actions were it not for the actions of Mr. Kahn and Holland & Knight and the fortuitous delay in the Client securing the necessary permits.

provide that the "[t]he elements of the offense of uttering ... are that ... [t]he written instrument in question was falsely made, altered, signed or endorsed, ... [and] defendant issued ... the written instrument to someone ... [knowing] that the ... instrument was not genuine but was falsely made, altered, signed or endorsed and ... intended to deceive or cheat someone for the purpose of either causing some financial loss to another or bring ... about some financial gain to himself...." Matthew Bender, Criminal Jury Instructions for the District of Columbia, D.C. Instruction 5.210 (2009).

**22.** *See* Tr. 86–90, 103–05.

While the evidence may not establish that Respondent forged those signatures for the purpose of retaining his job, it is clear that he forged the signatures to protect his reputation and standing with Mr. Kahn, the Client, and the firm. Since the benefit required to demonstrate fraudulent intent need not be monetary or material, the intent to preserve his reputation or image is sufficient to support the finding that he committed a criminal act proscribed by D.C.Code § 22–3241(b), and thus violated Rule 8.4(b). Further, his conduct clearly "reflects adversely on [Respondent's] ... honesty, integrity, trustworthiness, [and] fitness as a lawyer in other respects...." That is particularly true given that the Court has advised that it is not our job to determine under Rule 8.4(b) whether a respondent committed a crime, but rather whether "the conduct at issue was a criminal act that merits disciplinary sanction...." *Slattery,* 767 A.2d at 207. And, falsifying signatures on a document as well as falsely purporting to have had the signatures notarized with the intent to deceive one's client is the type of "criminal conduct that reflects adversely on a lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects ..." as proscribed by Rule 8.4(b). Accordingly, we conclude that Bar Counsel has established that Respondent violated that rule in signing the names of the other parties to the purported ERA and affixing the names of fictitious notaries.

While we find that Bar Counsel has established a violation of Rule 8.4(b), our recommended disposition is not affected by that conclusion. His violation of the other rules, including his violation of Rule 8.4(c), is sufficient, we believe, to support our recommended sanction.

ii. *Violation of D.C.Code § 22–1404*

The Hearing Committee concluded that Respondent violated D.C.Code § 22–1404 by signing the names of fictitious notaries to the ERA. H.C. Rep. at 32–33. For the reasons set forth below, we conclude that the Hearing Committee erred in reaching that conclusion.

D.C.Code § 22–1404 provides " '[w]hoever falsely represents himself or herself to be a ... notary public ... and attempts to perform the duty or exercise the authority pertaining to ... such office' is guilty of a felony punishable by up to three years in prison." We have been unable to find, and neither party has cited to us, any case construing the portion of this section relating to notary publics or attempts to perform the functions of a notary. The few cases we found involved the impersonation of a police officer, and in each of them, the defendant had impersonated a police officer and attempted to exercise the powers of a law enforcement official. *Gary,* 955 A.2d 152; *Williams v. United States,* 404 A.2d 189 (D.C.1979). There is no similar conduct here: Respondent did not hold himself out as a notary and never purported to exercise the powers of a notary himself. *Compare Fentress v. United States,* 228 F.2d 646 (D.C.Cir.1955).

Since D.C.Code § 22–1404 requires that the actor both impersonate a notary and attempt to perform the functions of a notary, we conclude that Bar Counsel did not establish that Respondent violated that section. As shown by the D.C. jury instructions, the government has to establish both that the defendant "falsely represented [him/herself] to be a notary public and ... made statements or took action in an effort to perform the duty or exercise the authority of a notary public" in order to establish a violation of D.C.Code § 22–1404. Matthew Bender, Criminal Jury Instructions for the District of Columbia, DC Instruction 6.130 (2009). Respondent nev-

er held himself out as a notary.[23] Consequently, we find that Bar Counsel has not established a violation of Rule 8.4(b) with respect to his claim under D.C.Code § 22–1404.

### Sanction

As the Court and the Board have noted, the imposition of the appropriate sanction in a disciplinary matter is not an exact science. Rather, the proper sanction depends on the facts and circumstances of each case. *See In re Thyden,* 877 A.2d 129, 144 (D.C.2005). In deciding the appropriate sanction, we are enjoined to consider (a) the nature and seriousness of the misconduct, (b) the prejudice, if any, to the client resulting from the misconduct, (c) whether the conduct involved dishonesty or misrepresentation, (d) the presence or absence of violations of other ethical rules, (e) whether the respondent has been disciplined previously, (f) whether the lawyer acknowledges and is genuinely remorseful about his misdeeds, and (g) any other circumstances in mitigation or aggravation. *In re Jackson,* 650 A.2d 675, 678–79 (D.C. 1994) (per curiam) (appended Board Report). To the extent practicable and feasible, the discipline imposed should be comparable to that imposed in other cases involving similar violations, but with the recognition that the disciplinary system is not intended to be punitive, but to protect the public and the courts, safeguard the integrity of the Bar and deter similar misconduct. *In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987) (en banc); *Reback,* 513 A.2d at 231.

#### (a) *The Nature of the Misconduct*

The Hearing Committee concluded that "Respondent engaged in serious misconduct, including criminal acts and dishonesty directed at his Client." H.C. Rep. at 41. Among the Rule violations were (a) lying to the Client and Mr. Kahn as to the status of the ERA, (b) forging the signatures of the adjacent landowners and other parties, (c) signing the names of fictitious notaries to create the impression that those signatures were notarized, (d) falsely assuring the Client that the other parties had agreed to the terms of the ERA, (e) falsely assuring the Client that the ERA had been filed with the District of Columbia land records, (f) falsely assuring the Client that the construction notice had been sent to the other parties, (g) lying to Bar Counsel when he reported his misconduct and when he cancelled the initial meeting, and (h) lying during the hearing. The Hearing Committee found that this conduct breached Respondent's fiduciary obligations to his client to represent them diligently, to deal with his client honestly, not to prejudice its interests, and to keep the Client informed as to the status of the matter. We agree. Respondent's conduct constituted a serious breach of his responsibilities as a lawyer and, notwithstanding his assertions that they were caused by his addiction, stress, lack of sleep, and other problems, *see* Resp. Brief at 6–8, they cannot be ignored or go unsanctioned. These Rule violations require a prolonged suspension, even if they do not rise to the level of disbarment.

---

**23.** Moreover, the Court of Appeals for the District of Columbia Circuit held, in construing the predecessor provision of D.C.Code § 22–1404, that criminal intent is an essential element of the crime even though the statute by its terms does not require any particular intent. *Levine v. United States,* 261 F.2d 747, 751 (D.C.Cir.1958). While the Court held that the requirement did not necessarily require "proof of 'intent to defraud'", *id.,* the Court concluded that the government had to establish that the defendant acted with a "criminal or felonious intent." *Id.* Bar Counsel did not bear that burden here; at best, Respondent intended to deceive the Client as to the status of the ERA.

#### (b) *Prejudice to the Client*

Respondent argued in his Findings of Fact and Conclusions of Law that the Client was not materially prejudiced because of his conduct. Respondent Theodore S. Silva, Jr.'s Proposed Findings of Fact, Conclusions of Law and Recommendation as to Sanction at 4, ¶ 5 (filed Feb. 1, 2008).[24] The Hearing Committee rejected that argument, finding that the Client avoided serious financial harm only because of the actions taken by Mr. Kahn and Holland & Knight to cure the problems he created, and the fortuitous turn of events that the Client had not secured all the permits it required. *See* H.C. Rep. at 43. We agree. Holland & Knight paid approximately $150,000 to the other parties and their counsel and absorbed the cost of approximately 50 hours of Mr. Kahn's time. Tr. 62–66.

#### (c) *Dishonesty or Misrepresentation*

There is no question that Respondent acted dishonestly. His actions entailed a pattern of lies and misrepresentations to the Client and Mr. Kahn, a partner who had put a great deal of trust in him. That pattern was followed in his dealings with Bar Counsel, where he lied when he stated that he had stopped using cocaine; had enrolled in a treatment program in 2006; submitted to random drug testing; and that his nephew had died. He lied when he filed his *Kersey* plea in mitigation when he stated that he had been attending AA and NA meetings since January 2006, and he lied to the Hearing Committee when he testified that he had ceased using cocaine in May 2006. He lied to the Kolmac Clinic to avoid after-care when he told them his father had died. There is no excuse for this continuing breach of a lawyer's fundamental obligation to be honest and truthful.[25] *In re Lopes,* 770 A.2d 561 (D.C. 2001); *In re Goffe,* 641 A.2d 458 (D.C.1994) (per curiam); *In re Steele,* 868 A.2d 146 (D.C.2005). His conduct raises serious questions as to Respondent's basic qualifications to serve as a member of the District of Columbia Bar.

#### (d) *Other Ethical Rule Violations*

Respondent has been charged and found guilty of violating eight rules in connection

24. In his brief, Respondent attempts to disassociate himself from this proposed finding, arguing that it was filed without his having an opportunity to review the proposed findings. He claims he was participating in the Second Genesis program when the proposed findings were prepared and filed and was sequestered at Second Genesis' treatment center in Crownsville, MD at the time. Thus, he asserts that he never had the opportunity to review the proposed findings. Resp. Brief at 16. However, his disclaimer is tempered by his assertions, discussed below, that the Client was not really harmed. *See supra* at 940.

25. In his Brief, Respondent argues that many of these lies where not "under oath." Resp. Brief at 10–15, 24–26. We assume that Respondent is somehow arguing that, because he was truthful under oath, his lies are somehow less venal. Putting aside the dubious nature of that proposition, Respondent lied under oath at the hearing; on at least one occasion he testified that he stopped using cocaine in May 2006. He only corrected the statement under prodding by Bar Counsel. *See* Tr. 220–21. In all events, Rule 8.4(c) makes it clear that a lawyer's obligation to deal honestly and truthfully does not depend on whether he is under oath. Respondent also claims that he did not lie "to his clients or rely on deception (other than the misconduct in this case) in his practice of law." Resp. Brief. at 26. However, that claim is questioned by his own testimony where he acknowledged that he had a problem with telling the truth and that he had managed to get himself out of similar situations in the past. *E.g.,* Tr. 257.

with this matter. While not formally charged, it appears that he also violated Rule 3.3 by lying in his *Kersey* plea and during the hearing, and Rule 8.1 in lying to Bar Counsel when he self-reported and when he sought to postpone a meeting with Bar Counsel. The number of rule violations found, albeit arising essentially in a single matter, require a substantial sanction.

#### (e) *Prior Discipline*

Respondent has not been subject to any prior discipline. However, he failed to report the results of the Virginia disciplinary proceeding. *See, e.g., In re Sawyer,* 953 A.2d 1019 (D.C.2008) (per curiam); *In re Gardner,* 650 A.2d 693 (D.C.1994). And, as noted below, *see supra* at 940–41, that disciplinary action forecloses any mitigation for the absence of any prior disciplinary action.

#### (f) *Respondent's Remorsefulness*

The Hearing Committee concluded that Respondent "did not express any genuine remorse for his misconduct." H.C. Rep. at 50. It noted that, while he admitted that his conduct was wrong, he did not testify that he was sorry, had not apologized to the Client, and, in fact, contended that the Client benefitted from his actions. The Hearing Committee also found that Respondent had not expressed any remorse for the harm he caused the firm. *Id.*

Respondent disputes these conclusions in his brief, Resp. Brief at 26–28, and during oral argument. However, his expressions of remorse are qualified. For example, while Respondent purports to ac-

knowledge that his conduct was harmful, that acknowledgement is tempered by efforts to minimize the harm. Thus, he states that he "understands the seriousness of his misconduct and that the Client *might have suffered* construction delay costs if Mr. Kahn had not risen to the occasion," *id.* at 16–17 (emphasis added), and asserts that he avoided causing the Client serious harm by not recording the ERA with the District of Columbia land records. *Id.* at 17. Although he "acknowledges that Holland & Knight incurred losses as a result" of his conduct, he notes that the firm "also received millions of dollars in fees from the Client" and continues to represent the Client. *Id.*

In short, Respondent's acceptance of the seriousness of his misconduct rings hollow and does not show the remorse that might warrant a lessened sanction. He has also not taken any steps to demonstrate his purported remorse, such as attempting to repay Holland & Knight a portion of the costs they incurred as a result of his misconduct.[26] In all events, the determination whether Respondent was remorseful is in the nature of a credibility finding, and we are to defer to the credibility findings of the hearing committees, unless clearly erroneous. *In re Ukwu,* 926 A.2d 1106, 1115 (D.C.2007). The finding here is not clearly erroneous.

#### (g) *Mitigating or Aggravating Circumstances*

Respondent maintained that his clean record was a mitigating factor. The Hearing Committee rejected that argument, finding that he had not revealed the Virginia disciplinary action that is the subject of

**26.** Respondent argues that he should not be faulted for not reimbursing the firm because he does not and did not have the resources to do so. Resp. Brief at 27. However, he has not even tried. Indeed, he squandered a sub- stantial portion, if not most, of his bonus and severance package on cocaine, rather than attempting to make amends for his misconduct. *Cf. Slaughter,* 929 A.2d at 448.

the reciprocal discipline matter before the Board. Indeed, the Hearing Committee found that his failure to disclose the Virginia disciplinary proceeding coupled with his assertion that he had no prior discipline were aggravating factors. H.C. Rep. at 45–46. In his brief, Respondent contends that he was advised by his counsel at the time that he did not have to report the conviction to the Virginia Bar because the sentence imposed was "probation before conviction." Resp. Brief at 23. He also maintains that, because he was effectively sequestered at the Second Genesis center when the Virginia Bar matter arose, he did not learn of the Agreed Disposition, entered on January 31, 2008, until he was discharged from the Second Genesis program on February 21, 2008. *Id.* at 21–23. We have trouble believing Respondent's claims concerning his lack of knowledge since we find it unlikely that counsel would enter into an Agreed Disposition without consulting with Respondent. However, we will give Respondent the benefit of the doubt and not fault him for seeking mitigation of any sanction based on his lack of prior discipline. The same counsel represented Respondent before the Virginia disciplinary authorities and filed Respondent's Proposed Findings of Fact and Conclusions of Law seeking the mitigation. Counsel obviously knew of the Virginia action. We do not know whether Counsel or Respondent made the error in seeking the mitigation. While we do not concur in the Hearing Committee's conclusion that his effort to seek mitigation for lack of prior discipline was an aggravating factor, we also believe that mitigation for

the absence of prior discipline is inappropriate.

The Hearing Committee also rejected Respondent's *Kersey* mitigation claim. It held that his addiction to cocaine was foreclosed by the Court's decision in *Marshall, supra,* and "because he failed to show by a preponderance of the evidence that his use of cocaine caused him to engage in the misconduct." H.C. Rep. at 44. It concluded that any addiction to alcohol did not entitle him to *Kersey* mitigation, finding that his "use of cocaine and alcohol did not impair his ability to recognize or appreciate the wrongfulness of his conduct or conform his conduct to the ethical rules." *Id.* at 44–45. And, in all events, it found that he had failed to meet the third prong of the *Kersey* test because he had not shown that he had been substantial rehabilitated. *Id.* at 45. Finally, it rejected arguments that his lack of prior discipline and recognition of some of his misconduct did not warrant any mitigation since those factors were "either unfounded or significantly outweighed by the aggravating evidence." *Id.* at 45.

These conclusions are fully supported by the record. Respondent has not begun to make a *prima facie* case under *Kersey*.[27] His reliance on his cocaine addiction is foreclosed by *Marshall, supra,* even if he had shown that his actions were caused by his addiction or that he had been substantially rehabilitated. However, he made neither showing. Indeed, Respondent's own testimony indicated that his dishonesty was endemic and unaffected by his cocaine addiction. FF 61, H.C. Rep. at 26; Tr. 256–57. Further, the only evidence of rehabilitation came after the hearing in

---

**27.** The Hearing Committee rejected his *Kersey* mitigation claim not only on the merits, but also on the procedural ground that he never submitted the motion setting forth the material facts in support of his assertion of addiction, as required by Board Rule 11.12(a). H.C. Rep. at 18–19 n. 7 & 43. Since we find the decision fully supported on the merits, we do not reach the procedural basis for its decision.

this case when he entered the Second Genesis program, and that came too late. *See Marshall*, 762 A.2d at 539. Finally, Respondent did not meet his burden of proof with respect to his claim that he was addicted to alcohol or was suffering from ADD, ADHD and depression. Even assuming *arguendo* that Respondent had borne that burden, he did not establish that any of those problems caused his misconduct.

*Recommendation as to Sanction*

As the Hearing Committee concluded, the record in this case demonstrates a pattern of deceit and intentional falsehood and misrepresentation that warrants a severe sanction. It found, that "disbarment is appropriate here because of the aggravating factors, including Respondent's dishonesty and other Rule violations that were not isolated, and the fact that Respondent acted intentionally and for his own personal benefit, the misconduct was practice related, and the misconduct was aggravated by false testimony at the hearing and prior undisclosed Virginia disciplinary action." H.C. Rep. at 52.

While we fully agree with the Hearing Committee's conclusions that Respondent's conduct was extremely serious and requires a substantial sanction, we do not believe that precedent supports disbarment. The Hearing Committee did not cite any case involving comparable rule violations that resulted in disbarment, nor has Bar Counsel. Both instead analogize this case to *Slaughter, supra*, and rely on dicta in the Court's decision to support disbarment. For example, the Hearing Committee concluded that Respondent's conduct was more serious than the conduct in *Slaughter* because Respondent "engaged in further dishonesty by making knowing false statements, including while under oath at the hearing." H.C. Rep. at 52. Citing to the Court's statement that the sanction in *Slaughter* was on the lenient side for his forgery and advising his law firm that he had been retained by the State of Arkansas and other misrepresentations, which cost the firm $1.5 million, the Hearing Committee concluded that disbarment here was appropriate. *Id.* at 50–51. The Hearing Committee also found that Respondent's conduct was more reprehensible than that of the respondents in *In re Addams*, 579 A.2d 190 (D.C.1990) (en banc) and *In re Robinson*, 583 A.2d 691 (D.C.1990) (per curiam), in which the respondents were disbarred for misappropriation of client funds. H.C. Rep. at 52. Bar Counsel relies on the Court's statement that Slaughter would have been disbarred had he been found guilty of forgery, B.C. Brief at 48, which it alleges is the case here. Bar Counsel also cites to *Goffe, supra*, and *In re Pelkey*, 962 A.2d 268 (D.C.2008) to support disbarment. B.C. Brief at 48.

Although we find Respondent's misconduct was inconsistent with his obligations as a lawyer, we do not believe that *Slaughter* or any of the other cases cited by the Hearing Committee or Bar Counsel support disbarment. Mr. Slaughter was not disbarred and he was found to have engaged in forgery. And, while Respondent lied under oath,[28] that misconduct does not generally result in disbarment even when accompanied by dishonesty. *See, e.g., In re Cleaver–Bascombe*, 892 A.2d 396 (D.C. 2006), *on remand*, Supplemental Report and Recommendation of the Board on Pro-

---

28. We are deferring to the Hearing Committee's credibility determination here. We note, however, that Respondent corrected his statement later when cross-examined by Bar Counsel, Tr. 220–21, and he has consistently maintained that his use of cocaine in November 2006—he used it three times—was a lapse and not a return to its use. Tr. 221.

fessional Responsibility, Bar Docket. No. 183–02 (BPR July 21, 2006) (Court review pending) (two-year suspension with fitness for violating, *inter alia*, Rules 3.3 and 8.4 by filing a false CJA voucher and committing perjury at the hearing).

Rather, cases involving falsification of documents, including false notarizations involving a single client-matter have resulted in suspensions, from a month to several years. *See, e.g. In re Uchendu*, 812 A.2d 933 (D.C.2002) (30–day suspension for violating Rules 3.3(a) and 8.4(c) by knowingly submitting to the probate court verified documents where respondent had signed clients' names and falsely notarized them); *In re Mendoza*, 885 A.2d 317 (D.C.2005) (per curiam) (90–day suspension for violating Rule 8.4(c) by knowingly providing false criminal justice vouchers to induce payment of funds not earned); *In re Schoeneman*, 891 A.2d 279 (D.C.2006) (per curiam) (four-month suspension for violating, *inter alia*, Rule 8.4(c) for making false statements to clients regarding the status of their cases and his suspension from practice); *In re Wright*, 885 A.2d 315 (D.C. 2005) (per curiam) (one-year suspension for violating, *inter alia*, Rules 4.1(a), 8.1(a), and 8.4(c) for not paying medical providers by falsely representing in letters that the cases hadn't settled and that he had reduced his own fees); *In re Parshall*, 878 A.2d 1253 (D.C.2005) (per curiam) (18–month suspension for violating Rule 3.3(a) by intentionally filing a false status report with the Court and fabricating false supporting documents); *Steele*, 868 A.2d 146

(three-year suspension with fitness for violations of, *inter alia*, Rules 8.4(c) & (d) by lying to clients as to the state of the case and fabricating a false subpoena).

In contrast, the cases in which attorneys have been disbarred have involved prolonged misconduct involving dishonesty, misappropriation of client funds or actions that abused the attorney-client relationship. For example, in *In re Rogers*, 902 A.2d 103 (D.C.2006) (per curiam), the respondent was disbarred when he took advantage of his position as an attorney and personal friend of an elderly client to convert approximately $260,000 in cash and assets for his personal use. In *In re Anya*, 871 A.2d 1181 (D.C.2005) (per curiam), the respondent was disbarred where there were 11 separate ethical complaints involving dishonest conduct, making false statements to a court, and falsifying court records. Similarly, in *Goffe, supra,* the respondent was disbarred for a pattern of dishonesty and providing false evidence, forging signatures, and falsely notarizing signatures. *In re Foster*, 699 A.2d 1110 (D.C.1997) (per curiam), involved 23 violations of numerous rules, and "appalling" and "deplorable" conduct in three distinct matters, including lying to his clients and the court and failing to participate in the disciplinary proceedings against him. Finally, *Pelkey, supra,* involved the theft of a partner's interest in a business and other serious breaches of his obligations as a lawyer.[29]

Respondent's conduct here, while falling far below the standards acceptable for

---

**29.** The Court held disbarment was appropriate because of Pelkey's "(1) persistent, protracted, and extremely serious and flagrant acts of dishonesty (witnessed by the arbitrator, the hearing committee, and the California State Court of Appeal, and detailed herein); (2) his criminal conduct which amounts to theft as he sought to deprive Ms. Cavalli (with whom he also had a personal/romantic relationship that he denied) of any of the benefits of her labor and investments in the Pelkey/Cavalli business ventures by taking and controlling the monetary fruits of the ventures for his own personal use; as well as (3) his unconscionable actions in the courts, especially the California courts." *Pelkey*, 962 A.2d at 282.

members of the Bar, does not rise to the level of those who were disbarred. His misconduct, although not isolated, related to a single matter. His dishonesty in dealing with Bar Counsel and his false testimony at the hearing clearly aggravate the misconduct, but it does not rise to the level of dishonesty in *Goffe, supra, Anya, supra,* or *Pelkey, supra.* Rather, his conduct with respect to his client comes close to the conduct involved in *Schoeneman, supra,* and *Uchendu supra,* where relatively short suspensions were involved. His conduct in purporting to notarize the signatures on the purported ERA is comparable to the conduct involved in *Ukwu, supra,* and *Parshall, supra,* which involved falsifying documents, and his false testimony is similar to the conduct involved in *Cleaver–Bascombe, supra,* where the respondent lied to the hearing committee.

In many respects, this matter is analogous to *In re Guberman,* 978 A.2d 200 (D.C.2009), although Respondent's misconduct was more serious than the conduct there. In *Guberman,* the respondent had "falsely represented to ... representatives of the firm that he had filed an appeal in [the client's] case" and "falsified filing stamps on papers, falsely certifying that the papers had been filed in court." *Id.* at 204 (citing *Attorney Grievance Comm'n of Md. v. Guberman,* 392 Md. 131, 896 A.2d 337, 339–40 (2006)). The Maryland courts disbarred Mr. Guberman, but the Court of Appeals held, based on a lengthy review of sanctions imposed in the District of Columbia for intentional dishonesty, that reciprocal discipline was not warranted because the sanction for intentional dishonesty in the District of Columbia is a suspension of between 30 days to three years. *Id.* at 208–09. Consequently, it imposed an 18–month suspension, which it called mid-range. *Id.* at 210.

Respondent's conduct here involves misconduct not present in *Guberman,* including Respondent having deceived his client, and a lack of the remorse which Mr. Guberman demonstrated. Thus, Respondent's misconduct warrants a longer suspension. We recommend, based on the record of extensive dishonesty and falsity, a three-year suspension, the outer range of suspensions for violations of the Rules involved here.

*The Fitness Requirement*

In addition to establishing that Respondent has engaged in serious misconduct which warrants a severe sanction, the record also raises serious questions as to Respondent's fitness to practice law. Throughout his brief before the Board, Respondent maintains that his misconduct was the result of his cocaine addiction. That addiction has been ongoing, with only a short break while on probation from a cocaine possession charge and during most of this proceeding, since he was in college. It continued after his misconduct resulted in his discharge from Holland & Knight until he ran out of money. He reverted to its use almost immediately, albeit in a limited manner, after he returned to the Washington area after spending time with his brother on Cape Cod. He effectively admitted that cocaine assumed a dominant role in his life, Tr. 146–52, and, while the evidence may not suffice to demonstrate that it caused his conduct here, there is substantial evidence in this record that his cocaine addiction played a role in his conduct and is a matter of serious concern as to his fitness.

That concern is aggravated by his admitted history of having trouble telling the truth, which was demonstrated throughout this proceeding. Given those concerns, we recommend that Respondent be required to demonstrate his fitness before he can resume the practice of law. As the

Court noted in *Cater*, 887 A.2d 1, the decision to suspend an attorney and whether to impose a fitness requirement turns on different considerations. "[T]he decision to suspend an attorney turns largely on the determination of historical facts ... [while] a fitness requirement turns on a partly subjective, predictive evaluation of the attorney's character and ability." *Id.* at 22. A fitness requirement is designed to assure that an attorney "will act ethically and competently in the future, after the period of suspension has run. Primarily, our 'concern is that the [attorney's] resumption of the practice of law will not be detrimental to the integrity and standing of the Bar....'" *Id.* (citations omitted). Thus, in order to impose a fitness requirement, the record "must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law." *Id.* at 24.

The decision whether to recommend fitness is to be informed by the following five factors set forth in *In re Roundtree*, 503 A.2d 1215, 1217 (D.C.1985):

(a) the nature and circumstances of the misconduct for which the attorney was disciplined;

(b) whether the attorney recognizes the seriousness of the misconduct;

(c) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones;

(d) the attorney's present character; and

(e) the attorney's present qualifications and competence to practice law.

There is no question that the first factor weighs heavily in favor of imposing a fitness requirement. Respondent lied to the Client, his partner, the Kolmac Clinic, Bar Counsel and the Hearing Committee. His dishonesty was extensive and pervasive, adversely affecting the transaction he was employed to advance and jeopardizing the Client's interests. It is only through the extraordinary efforts of Holland & Knight and a delay in his client's securing the necessary permits that substantial harm did not befall the Client. His dishonesty continued throughout the disciplinary process, where he either lied or dissembled, acknowledging the truth only when forced to face it.

We also have grave doubts that Respondent fully accepts the seriousness of his misconduct. He maintains in his brief and at oral argument that he is remorseful and that he recognizes that his conduct was unacceptable, but, as noted above, his expressions of remorse leave much to be desired and, given his history of not telling the truth, one has to accept his statements with a certain degree of skepticism. The third criterion—steps taken to remedy the past wrong—is technically not applicable here since Respondent has not yet been sanctioned. However, Respondent's conduct after his malfeasance was discovered does not evidence a meaningful recognition that he needed to mend his ways. He did not cease using cocaine until he ran out of money and did not report the misconduct to Bar Counsel until after Holland & Knight reported him, even though the firm gave him the option of coming forward first. When he finally reported, his report was rife with statements that he knew were untruthful, including postponing a meeting with Bar Counsel that he had requested based on the lie that his nephew was killed in an automobile accident. The only steps he took to prevent future misconduct came after the hearing when he entered the Second Genesis program.[30]

---

**30.** Respondent maintains in his brief that he has been "clean" since he left Second Genesis

The fourth and fifth criteria favor imposition of a fitness requirement. While Respondent's drug reports indicate that he appears to have stayed away from cocaine since December 2007, his long history of drug use raises serious questions as to his ability to stay away from drug use once he is not being closely supervised. He continued to use the drug after his sentence for possession in Virginia and only stopped when his probation officer threatened to turn him in. He resumed using cocaine almost immediately after his sentence was vacated in Virginia and used it extensively during the period in which his misconduct occurred. He continued to use it after he was fired by Holland & Knight, squandering the bulk of his bonus and severance package on cocaine. And, he resumed using it, albeit only three times, when he returned to the District of Columbia from Massachusetts, where he had gone to live with his brother, a lobster fisherman. We are also concerned about his efforts to avoid having his wages garnished to pay for child support. That conduct raises serious questions as to his integrity.[31]

In sum, the record in this case raises serious questions about Respondent's ability to remain free of cocaine and his ability to tell the truth. Indeed, Respondent testified that he has trouble telling the truth and has a pattern of dishonesty and dissembling. From the record here, it appears that the tendency to lie or dissemble is corrected only when there is no other way out. That conduct raises fundamental questions as to his fitness to practice law. Consequently, we strongly recommend that Respondent be required to show his fitness to practice before being allowed to practice once his suspension ends.

## II. RECIPROCAL DISCIPLINE MATTER

(Bar Docket No. 062–08)

*Facts*

Respondent was arrested in 2002 in Arlington County, Virginia, and pled guilty to possession of cocaine. His sentencing was suspended and Respondent was placed on probation for two years subject to the condition that (a) he enter and complete a drug counseling/treatment program as directed by his probation officer and (b) complete 100 hours of community service. His driver's license was suspended for six months.[32] Upon completion of his probation, his guilty plea was vacated and the indictment was dismissed.[33]

---

and continues to take positive steps to stay away from cocaine. Resp. Brief at 20. Since there has been no opportunity to test Respondent's claims through investigation or cross-examination, they do not suffice to erase the troubling record before us. *See Cater*, 887 A.2d at 6.

31. Bar Counsel and the Hearing Committee faulted Respondent for not paying child support while he was using cocaine, asserting that it raised questions as to his fitness. B.C. Brief at 44, H.C. Rep. at 53. We agree that Respondent's conduct was unacceptable and raises fitness questions, but we do not think his failure to make those payments raises fitness questions beyond those raised by his

cocaine addiction. His need for the drug drove his conduct and his failure to make the required payments is characteristic of a drug addiction. *See, e.g.*, Understanding Drug Abuse and Addiction, National Institute on Drug Abuse, at http://www.nida.nih.gov/Infofacts/understand.html (visited Dec. 18, 2009). Moreover, we note that he paid a portion of his children's college tuition even though he was not obligated to do so. Tr. 159.

32. *See* Order, *Virginia v. Silva*, CR02–2286 (Apr. 15, 2003).

33. *See* Order, *Virginia v. Silva*, CR02–2286 (Mar. 15, 2005).

Respondent did not report his cocaine conviction to either the District of Columbia Court of Appeals or the Board,[34] nor did he report it to the Virginia State Bar, where he was also admitted to practice. In 2007, the Virginia Board learned of the conviction and, on December 27, 2007, issued an order directing Respondent to show cause and a notice of a hearing to be held in January 2008 relating to his conviction. Subsequently, Respondent and Virginia Bar Counsel entered into a Agreed Disposition of a Public Reprimand With Terms, which was accepted by the Virginia Board on January 31, 2008, after the original matter in this consolidated proceeding had commenced. The Virginia Board issued an Order of Public Reprimand With Terms which required, *inter alia,* that Respondent (a) comply with our December 4 and 10, 2007 Orders, and (b) authorize D.C. Bar Counsel to notify the Virginia Bar Counsel of any finding of noncompliance with those Orders. The Order also provided that the terms of discipline remain in effect until January 25, 2010 and, if Respondent failed to comply with the two other terms, he would receive a one-year suspension.[35]

Bar Counsel learned of Respondent's conviction on or about November 30, 2007, when Bar Counsel received the report from his forensic psychiatrist, who interviewed Respondent in connection with the original matter. *See* Statement of Bar Counsel in Bar Docket No. 062–08 at 2 (filed Apr. 3, 2008) ("April 3rd Statement").[36] Bar Counsel received a copy of the Virginia Board's public reprimand on February 7, 2008, *id.* at 4, and notified the Court of Appeals of the Virginia disciplinary action on February 11, 2008. *See* Letter dated Feb. 11, 2008 from Bar Counsel to Garland Pinkston, Jr., Esq., Clerk of the District of Columbia Court of Appeals.

On March 4, 2008, the Court referred the matter to the Board for a determination whether identical, greater or lesser discipline should be imposed or whether the Board elects to proceed *de novo* pursuant to D.C. Bar R. XI, § 11. Order, *In re Silva,* No. 08–BG–82 (D.C. Mar. 4, 2008). The case was consolidated with the original matter at the unopposed request of Bar Counsel. Order, *In re Silva,* Bar Docket Nos. 077–06 & 062–08 (BPR Apr. 6, 2009).

Respondent has not addressed the reciprocal discipline aspects of this proceeding other than to contest the Hearing Committee's conclusion that his failure to report the violation was an aggravating factor in the original case, Resp. Brief at 21–23, and to urge the Board to consolidate the two cases. *See* Statement of Respondent in Bar Docket No. 062–08 at 1–2 (filed April 17, 2008). Bar Counsel has also not addressed the reciprocal matter except in its statement urging the two cases be consolidated. April 3rd Statement at 1. Virginia

---

34. D.C. Bar R. XI, § 10(a), requires lawyers that have been found guilty of a crime or have pleaded guilty or nolo contendere to a criminal charge to file with the Court and the Board a certified copy of the court record or docket entry of the finding or plea. Respondent argues that he was not required to report the cocaine possession conviction because his sentence was a "probation before sentence" and was eligible to have the conviction vacated if he satisfied the terms of his probation. As noted, the indictment was dismissed and his guilty plea was vacated. In light of our disposition, we do not reach the question of whether he was required to report the conviction.

35. *In re Theodore Scott Silva, Jr.,* Order of Public Reprimand, with Terms, VSB Dkt. No. 08–000–073253 at 2–3 (Jan. 31, 2008).

36. At that point, Respondent's conviction had been vacated.

imposed a public reprimand with terms. Under D.C. Bar R. XI, § 11 in place at the time the reciprocal matter was raised and when Bar Counsel urged that the reciprocal and original cases be consolidated, the Board was required to recommend identical discipline unless one or more of the following exceptions existed: (1) the procedure in the sister jurisdiction violated the attorney's due process rights, (2) there was such an infirmity of proof establishing the misconduct that the Court could not accept as final the conclusion on the subject, (3) the imposition of the same discipline would result in a grave injustice, (4) the misconduct warrants substantially different discipline in the District of Columbia or (5) the misconduct in the sister jurisdiction does not constitute misconduct here. None of these exceptions to the presumption of identical discipline applies here.

Under D.C. Bar R. XI, § 11(c), the Court will impose identical reciprocal discipline unless the respondent can establish an exception. Since Respondent has not objected to the imposition of reciprocal discipline, we would, prior to the recent amendments to D.C. Bar R. XI, have recommended reciprocal discipline here. However, recent amendments to D.C. Bar R. XI, § 11(c) provide for the publication "by appropriate means" where the disciplinary action by a sister jurisdiction consists of "public censure or reprimand that do not include suspension or probation." *See* Order, No. M–230–07 (D.C. Apr. 3, 2008). In an Order issued on September 4, 2008, the Court held that where Bar Counsel learns that a sister jurisdiction censured, reprimanded or admonished a member of the D.C. Bar, Bar Counsel should publish notice of that action "with-out having to refer individual matters to the Court for an order of publication." Order, No. M–234–08 (D.C. Sept. 4, 2008).

The revision to D.C. Bar R. XI, § 11(c) was effective on August 1, 2008, and the Court ordered the Board to proscribe by internal rule the manner in which Rule XI would be applied to cases that straddle the effective date of August 1, 2008. Order, No. M–230–07. On July 21, 2008, the Board issued an Order providing that the revised rule would only apply to reciprocal discipline cases filed by Bar Counsel with the Court on or after August 1, 2008. Order, *In re* Amendments to D.C. Bar Rule XI (BPR July 21, 2008) (the "Transition Order"). Bar Counsel notified the Court of Respondent's Virginia discipline on February 11, 2008, thus, pursuant to the Board's Transition Order, the revised D.C. Bar R. XI, § 11(c) is not applicable to this matter. However, the Court in both *Filomeno*, No. 07–BG–863 and *Portner*, 08–BG–28, applied the new rule to reciprocal discipline cases that were pending on August 1, 2008. And, in *In re Fitzgerald*, 982 A.2d 743 (D.C.2009), while the Court applied the prior rule to a pending reciprocal case, it noted that ordinarily changes in law apply to pending cases and that that "principle permits us to follow the amended rule in this case," but that it would apply the prior rule in *Fitzgerald*, "because we ... perceive no unfairness in applying the previous rules here...." *Id.* at 746. Given the actions and the expressed views of the Court on the application of the revised D.C. Bar R. XI, § 11(c) to cases such as this one, we recommend that the Court apply the new rule and order Bar Counsel to publish the Virginia disciplinary action on the D.C. Bar website.[37]

---

37. We make this recommendation notwithstanding the Board's Transition Order which would have applied the former D.C. Bar R. XI, § 11, given that subsequent decisions apply the new rule in circumstances such as those here.

## III. CONCLUSION

For the reasons set forth above, we recommend that the Court suspend Respondent for a period of three years effective for purposes of reinstatement from the date he files his affidavit required under D.C. Bar R. XI, § 14(g), require that he demonstrate his fitness as a condition of reinstatement showing that he has broken his cocaine addiction and not used cocaine during the period of his suspension, and direct Bar Counsel to publish the discipline imposed by the Virginia Board in accordance with D.C. Bar R. XI, § 11(c).

BOARD ON PROFESSIONAL RESPONSIBILITY

By: /TDF/
Theodore D. Frank

Date: December 31, 2009

All members of the Board concur in this Report and Recommendation except Ms. Cintron, who did not participate.